## CHARLESTOWN.

BARTLETT v. PATTON.

*(GREEN JUDGE, Absent.)

Submitted June 20, 1889.—Decided September 24, 1889.

1. WILLS—LIFE ESTATE IN CHATTELS—EVIDENCE.
Where chattels are given by will to a person for his life, without any limitation over in remainder, the legatee for life

---
*On account of illness.

| | |
|---|---|
| 33 | 71 |
| 40 | 724 |
| 40 | 820 |

| | |
|---|---|
| 33 | 71 |
| 52 | 395 |

| | |
|---|---|
| 33 | 71 |
| 58 | 20 |

| | |
|---|---|
| 33 | 71 |
| 59 | 581 |
| 60 | 302 |

| | |
|---|---|
| 33 | 71 |
| 61 | 397 |

| | |
|---|---|
| 33 | 71 |
| f62 | 128 |

| | |
|---|---|
| 33 | 71 |
| f64 | 66 |

has not absolute property in such chattels, but his estate is accountable to the estate of the testator for such chattels as the legatee in his lifetime, sold and converted to his use, or his administrator, after his death, sold and converted to the use of such legatee's estate ; but such is not the case with such chattels, as are consumed in their use (*quæ in usu consumuntur*) in which the legatee for life has an absolute property.

2. WILLS.

In order to vest in such legatee an absolute property in such chattels as are consumed in their use, they must be given as a specific, not as a general legacy, and not as a part of the residuum.

3. WILLS.

There may be a legacy given by implication, but to raise such implication it must be necessary to do so in order to carry out a manifest and plain intent of the testator which would fail unless such implication be allowed. Points 6, 7, 8, 12, 13, and 14 of the syllabus in *Graham* v. *Graham*, 23 W. Va. 46, reaffirmed.

4. WILLS—EVIDENCE.

A document not purporting to be a copy or abstract from the assessor's personal property list, but merely a certificate of a clerk of a county court of the assessment or non-assessment of a person or his property in such book, is not admissible in evidence.

5. WILLS—EVIDENCE.

In a suit by the personal representative of the testator to recover for chattels converted as above supposed, such personal property book itself would not be admissible to show the value of the personal estate of the testator or the legatee for life.

6. EVIDENCE.

It is not error to exclude evidence which would not have benefitted the party offering it.

7. EVIDENCE.

Where evidence is improperly rejected, and such evidence tends to prove an item which may or may not have been taken into account by the jury in fixing the amount in their verdict, and it is manifest and plain that outside of such item, under the evidence, there was ground for finding a verdict for at least the amount found by the jury, and a new trial is refused by the court below, this Court will not for that cause reverse the judgment.

8. EVIDENCE—DECLARATIONS.

A declaration made by a stranger to the controversy now dead, and against his pecuniary interest. may be admitted as evidence to show the existence of a fact relevant in such controversy as an exception to the rule excluding hearsay.

9. EVIDENCE—JURORS.

Reaffirming point 1 in *Probst* v. *Braeunlich*, 24 W. Va. 356, it is

settled in this state, as a general rule, with but few, if any, exceptions, that the testimony of jurors will not be received to impeach their verdict.

*J. J. Davis* for plaintiff in error.

*J. Bassell* for defendant in error.

BRANNON, JUDGE :

Jedediah W. Bartlett, administrator *c. t. a.* of John Ryan, brought *assumpsit* in the Circuit Court of Harrison county against John Patton, executor of Sarah Ryan, to recover the value of certain personal property which John Ryan had bequeathed for life to his widow, Sarah Ryan, and which had been in part sold and converted by her to her own use and in part sold by her executor as part of her estate. The case was tried by a jury on the issue raised by the general issue, a verdict rendered in favor of plaintiff for $477.50, and the court, overruling a motion for a new trial, entered judgment on the verdict; and John Patton, executor, sued out the writ of error now in hand. Other rulings upon the trial will appear in this opinion.

The main point of controversy in this case is whether, under the will of John Ryan, Sarah Ryan took an absolute or only a life estate in the personalty therein bequeathed. Plaintiff, contending that she took only a life-estate, after her death sued her estate to recover the value of the personalty which she in her lifetime, or her executor after her death, sold; and the defendant contends that her estate is not liable, because she took under said will an absolute estate.

The will says: "*Second.* I bequeath to my loving wife all my land or farm which I now live on, and all my personal property and money and bonds and household and *cichin* furniture and farming utensils, as long as she livs, I desire at the death of my wife, Sarah, that my farm which I now live on shal be sold, and one-half the money be devided equally between the heirs of my daughter Olive Bartlett, deceased, and the other to be divided equally between the heirs of my daughter Hannah Bartlett, deceased. I leave my wife my executor to live out my bequeath."

Originally we know that by our law there could be no lim-

itation over of a chattel, but that a gift carried the absolute
interest.   Then a distinction was taken between the use and
the property.   The use might be given to one for life, and
the property afterwards to another.   In *Randall v. Russell,*
3 Mer. 195, Sir WILLIAM GRANT, after adverting to the
former rule, says :   "A gift for life of a chattel is now con-
strued to be a gift of the usufruct only ; but when the use and
the property can have no separate existence it should seem
that the old rule must still prevail, and that a limitation over
after a life-interest must be held to be ineffectual."   He con-
ceived that a gift for life of things *quæ ipso usu consumuntur*
was a gift of the property, and that there could not be a
limitation over after a life-interest in such articles.   2 Rob.
Pr. (Old) 97 ; 2 Bl. Comm. 398 ; 2 Lomax, Ex'rs. 69.   Now,
there is no question but a life-estate to one with re-
mainder to another in personalty may be given, as recog-
nized in a large number of cases.   *Houser v. Ruffner*, 18
W. Va. 253, and cases cited ; *Frazer v. Bevill*, 11 Gratt. 9 ;
*Chisholm v. Starke,* 3 Call. 25, and cases below.

In *Madden v. Madden,* 2 Leigh, 377, it was held that under
the will the wife took an estate for life in such of the mova-
bles as were capable of being used and returned in kind,
and a *quære* was left whether the wife or her estate was ac-
countable to the legatees in remainder for such of the mova-
bles as were consumable in their use, such as grain or money
or debts.

In *Dunbar v. Woodcock,* 10 Leigh, 628, a will gave the
residuum of the estate, real and personal, to testator's wife
for life, and after her death gave the same, as well the land
as all other property remaining at her decease, to D. and wife,
the residuum consisting of farm, slaves, live-stock thereon, fur-
niture, farming utensils, crops of grain on hand, money, and
debts due ; and the wife took and held in kind during her life
the slaves, live-stock, furniture, and farming utensils, and she
appropriated the whole of the crops on hand to her own use.
It was held that the will gave the legatee for life no absolute
power of disposal of any of the property, and as to it all the
limitation in remainder was valid ; that as to grain on hand
the legatee for life was entitled to so much as was necessary
for consumption in her family for the year following tes-

tator's death, but her estate was accountable to the remainder-men for the value of the surplus thereof; that as to horses, farming utensils, and the like, such as were forthcoming at the life-tenant's death were to be returned in kind in their then state, though worn; such as died or were worn out were not to be charged to her; that her estate was to be charged with the principal of what she had sold, unless other articles of same kind were substituted; that brood-mares, flocks of sheep, and the like, the life-tenant must try to keep up in kind, and her estate was accountable for them accordingly, unless destroyed or impaired by casualty. But it is to be noted that that was under a bequest of the residuum, and as to chattels falling under a residuary bequest even those which are consumed in the use are not vested as absolute property in the legatee for life, and his estate must account for them; but they should be sold and the interest paid to the legatee for life and the principal kept for the remainder-man. 2 Kent. Comm. 353; 2 Lomax, Ex'rs, 71; Schouler, Ex'rs, § 342.

But as to those chattels consumed in the use, to give the legatee for life an absolute property in even them, the gift of them must be specific, not general. Kent says: "In the case of a bequest of specific things, as, for instance, corn, hay, and fruits, of which the use consists in the consumption, the gift of such articles for life is, in most cases, of necessity, a gift of the absolute property, for the use and the property can not exist seperately. If not specifically given, but generally, as goods and chattels, with remainder over, the tenant for life is bound to convert them into money and save the principal for the remainder-man." So, also, says Lomax, *supra.* In *Madden* v. *Madden*, 2 Leigh, 389, Judge GREEN leaned strongly against the legatee for life having any absolute property even in specific bequests of such consumable articles.

Now, in the will in this case there is no specific bequest of such articles. Its language is, "all my personal property and money and bonds and household and kitchen furniture and farming utensils." If the testator bequeathed any goods of a nature to be consumed in the use they must fall under the words "all my personal property," which is a general, not a specific, bequest, as if he had said, "my wheat, rye, bacon,

flour," and the other words do not import property of that nature. Money and bonds are there named, but they are not of that nature, but are capable of being given for life, with remainder over. Says Kent: "This limitation over in remainder is good as to every species of chattels of a durable nature, and there is no difference in that respect between money and any other chattel interest." Therefore, unless this will gave Sarah Ryan an absolute property in all the personal property, it gave it to her in no part of it, and I am of opinion that in all of it she had only a life-estate. The language, "I give to my loving wife all my land or farm which I now live on, and all my personal property and money and bonds and household and kitchen furniture, as long as she lives," is plain, and both in grammatical structure and common sense gives her a life-estate in both land and personal property. Had it stopped there, there could be no question of that. What is to change it? The suggestion in the petition for the appeal is made (for we have no argument or brief for appellant) that the balance of the will gives a remainder over in the real estate after the termination of the life-estate, but does not as to the personalty, and giving no remainder as to it would make the testator die intestate as to it if Mrs. Ryan took only a life-estate, which is against the presumption of law that, in the absence of evidence to the contrary, when one makes a will he is taken to intend to dispose of the whole estate.

It has again and again been said that the intention of the testator is the polar star to steer us in reaching the true construction of his will, and this intention is, if possible, to be reflected by its language. As was said by Judge TUCKER, in Miars v. Bedgood, 9 Leigh, 375, that intent will be "carried into effect whether the will be drafted with technical accuracy or not. The consequence of these principles seems to be that in the construction of wills which carry evidence upon their face that they have been the work of ignorant testators, and not of experienced and enlightened scriveners, (such is the case with the will of Ryan,) adjudicated cases can afford us little aid. As has been truly said by the great luminary of this Court, 'adjudged cases upon wills have more frequently been produced to disappoint than to illustrate the

intention.'" The remark here referred to is one of Pres. PENDLETON in *Shermer* v. *Shermer*, 1 Wash. (Va.) 271.

It has been well said in the United States Supreme Court that 'it may be "doubted if any other source of enlightenment in the construction of a will is of much assistance, than the application of natural reason to the language of the instrument under the light which may be thrown upon the intent of the testator by the extrinsic circumstances surrounding its execution, and connecting the parties and the property devised with the testator and with the instrument itself." *Clarke* v. *Boorman's Ex'rs*, 18 Wall. 493; *Cole* v. *Cole*, 79 Va. 255. We must look at the will, the relative situation of the parties, and decide on the circumstances of each case. 2 Minor, Inst. 963.

It seems to me, when we reflect that Ryan was aged, and his wife aged and frail, that his only heirs and distributees were eight grandchildren, three being children of his daughter Olive and five of his daughter Hannah, all his own children dead, his general design and intent was to give all his property, real and personal, to his wife for life, and after her death to these grandchildren. This was his reasonable, natural duty. His old wife would want his estate as long as she lived, and no longer; his grandchildren, with all of life before them, would need it all after her death. By the first part of the second clause of his will he in plain words did give his wife such life-estate. He did not expressly declare a remainder in the personalty in favor of his grandchildren, but did so as to the land. He knew that the law would pass the personalty to his grandchildren after his wife's death without any words in his will. He also knew that, if he did not otherwise provide, the land would on her death go to the grandchildren *per capita*, not *per stirpes*, thus giving the five children of one daughter more than three children of the other daughter, whereas he desired the children of each daughter to take just their mother's share; and he desired, also, that the land should not be partitioned, but sold, and the proceeds divided; and he was compelled to make a direction how the proceeds should go, to avoid such distribution, and in so doing he made this limitation in remainder as to the land. This is why he made such express limitation in re-

mainder as to the land. The personalty being small, the difference between its division *per capita* and *per stirpes* would be small, and perhaps he did not deem ,it essential to provide such a division as to it, or, more probably still, the unprofessional scrivener did not think of it, and its omission comes from a slip of his memory. Any-how, there is the language of the will.

Now, this absolute estate in Mrs. Ryan is to be raised by mere implication. That there are bequests by implication is true. 2 Redf. Wills, § 14, p. 201. But such implication must be a pregnant one, necessary to execute manifest intention, without which such intent would fail. Here to raise it would defeat such real intention. The theory of the defendant is to raise such absolute estate by implication, because the will does not expressly create a remainder to the grandchildren, and that, too, against the words of the will giving Sarah Ryan the personalty "as long as she lives." May it not with greater reason be urged that we should raise by implication a remainder to the grandchildren? To do so would not be against the words of the will, would give the property to distributees pointed out by law and those equally dear to the testator, his dead children's issue, who in the long life before them would need it after his widow had done with it. They, however, need no implication, as they take by law. As I have said, the intention was to give all his property to his wife for life, then to his grandchildren. We must not defeat this purpose by theory or conjecture, by the technical presumption that when a man makes a will he is presumed to intend to dispose of all his estate, and not die partially intestate. There is such a rule, having a salutary influence in proper cases. But there is another rule, certainly as well settled, that the heir is not to be disinherited except by plain language. The rule insisted upon has, in this case, to combat the other rule just stated. Here I quote, as apt, the language of the opinion of this Court by JOHNSON, P., in *Graham* v. *Graham*, 23 W. Va. 40.

"It was held by this Court in *Houser* v. *Ruffner*, 18 W. Va. 244, that, in construing wills, words and expressions of doubtful meaning will not be construed, if it can be avoided, so as to create an intestacy. The testator, having made his

will, will be presumed to have intended to dispose of his whole estate unless the contrary plainly appear. While this is true there is another rule quite as binding on the court in the construction of a will, viz., that the heir must not be disinherited unless it is done by express terms of the will or by necessary implication. *Irwin* v. *Zane*, 15 W. Va. 646. The heir at law never takes by the act or intention of the testator. His right is paramount to and independent of the will, and no intention of the testator is necessary to its enjoyment. On the contrary, such right can only be displaced or precluded by direct words or plain intention, evincing a desire upon the part of the testator that he shall not take, *etc.* He needs no argument or construction showing intention in his favor to support his claim. They belong to the party claiming under the will, and in opposition to him. *Augustus* v. *Seabolt*, 3 Metc. (Ky.) 155. In *Creswell* v. *Lawson*, 7 Gill & J. 227, it was held that the heir being favored in law there should be no strained construction to work a disherison where the words are ambiguous. * * * The intention of the testator must be gathered from the will itself whenever it is possible to do so. Every word is to have its effect, provided an effect can be given to it not inconsistent with the general intent of the whole will when taken together. * * * Where a former clause is express and particular, no subsequent clause shall be permitted to enlarge it if the two clauses can stand together. When a testator, in the disposal of his property, overlooks a particular event or matter which, had it occurred to him, he would probably have guarded against, the court will not employ or insert the necessary clause for the purpose of supplying the omission, and, though the inference of intention be more or less strong, yet, if not necessary or indubitable, the court will not aid the supposed intention by adding or supplying words."

We are asked here to insert words to give Sarah Ryan an absolute estate, whereas the will gives her only a life-estate, on a conjecture or hypothesis that such was his intention. This Court adopted, in *Graham* v. *Graham*, several points bearing on this case. Point 14 is here quoted: "When implications are allowed, they must be such as are necessary,

or at least highly probable, and not merely possible. In construing a will conjecture must not be taken for implication. Necessary implication means so strong a probability of intention that an intention contrary to that imputed to the testator can not be supposed. The whole will, taken together, must produce the conviction that the testator's intention was to create the estate raised by implication."

A clearly expressed intention in one part of a will is not to yield to a doubtful construction in another part. *Bell* v. *Humphrey*, 8 W. Va. 21. Clear and unambiguous provisions in a will expressly made can not be controlled by mere inference and argument from general and ambiguous provisions in other parts of a will. *Rayfield* v. *Gaines*, 17 Gratt. 1. Sarah Ryan took only a life-estate in said personalty. Therefore, upon her death, a right of action existed against her estate for the same, or the value of it, as she and her representative converted it. *Madden* v. *Madden, supra; Dunbar* v. *Woodcock*, 10 Leigh; 628; *Cross* v. *Cross*, 4 Gratt. 263 ; *Moorman* v. *Smoot*, 28 Gratt. 80 ; *Tabb* v. *Cabell*, 17 Gratt. 172 ; *Pettyjohn* v. *Woodruff*, 77 Va. 507.

So far, then, as concerns the contention that the court erred in refusing a new trial because Sarah Ryan had an absolute estate in this personalty, it is untenable. The defendant's complaint that the court refused to allow him to give in evidence the will of Sarah Ryan is not well founded. This will gave her grandchildren (children of said Olive and Hannah) one dollar each, and to other persons various legacies. I can not see that it is relevant to the matters involved in this cause. If the personalty did not belong to her estate, if she only had her life-estate, her will could not pass it; and if she had an absolute estate, the plaintiff could not recover from her representative anything on account of it, and this regardless of her will.

As to the assignment of error in rejecting the personal property books for 1872 and 1873, showing with what property Sarah Ryan was assessed, no assesssment for 1872, but only as to 1873, was offered as to her. The book was not offered, but only a certificate from the clerk of the County Court "that the following is an abstract showing the kind and amount of personal property with which Sarah Ryan is

charged on the property books of said county for the year 1873," giving the assessments under the several heads. No statute is cited to authorize the introduction of · such certificate or abstract. If the act found in Code, c. 130. § 5a, subsec.1, is relied on, it applies only to certificates of non-entry and entry of land, and requires them to be filed, and notice of the intention to use them to be given twenty days before the term. The personal property book was itself the primary evidence. I do not see, however, that the assessment book itself would be admissible.

There is no assignment of error for refusal of the court to admit certificates of the clerk as to assessment of property of John Ryan in 1872, and the non-assessment in 1873, unless there is an unintentional error in drawing the assignment · using the name Sarah instead of John, which is probable. Passing, then, upon this action of the court, the same objection applies to them, they being in the same form of certificates stated in reference to the certificate as to Sarah Ryan. Besides, it is questionable whether the book itself would have been admissible as to John Ryan's assessment. Moreover, these certificates show that in 1872, · John Ryan was assessed with $775.00, in 1873 nothing; and that Sarah Ryan was assessed in 1873 with $845.00. Had they been introduced, they would have tended to show that John Ryan about the time of his death (which was in 1873) had personal property greater in amount than the verdict, and that in the next year Sarah Ryan was charged with a greater amount than the verdict: So I can not see how the rejection of the evidence hurt the defendant. All her property at his death was, in law, his, for there is no proof sufficient to show that he ever consented to any of her property, so called, being held as separate estate to bind even himself. *Lanham* v. *Lanham*, 30 W. Va. 222, (4 S. E. Rep. 273.)

Another assignment of error is as to the refusal of the court to set aside the verdict because of misbehavior of a juror, John Flint. Affidavits of two jurors state that Flint, after the jury retired to consider the case, stated in their presence that he knew John Ryan, and that he had more personal property than he, (Flint,) and he (Flint) was assessed with $800.00. "It is settled in this state as a general

rule, with but few, if any, exceptions, that the testimony of jurors will not be received to impeach their verdict." *Probst* v. *Braeunlich*, 24 W. Va. 356. I simply refer to this case, and add the remark that there is no reason for making this instance an exception to that rule.

As to the error assigned for the admission of Hickman's evidence. After testifying that Stephen Ratliff was dead, he was asked to state whether shortly after John Ryan's death he heard Ratliff say anything about owing John Ryan any money at the time of his (Ryan's) death, and he stated that shortly after Ryan's death he heard Ratliff say he owed John Ryan $100.00 and Mrs. Ryan had called on him for it, and said if he did not pay it soon, she would sue him and make him pay; that Ratliff died, and he (Hickman) was his administrator, and Mrs. Ryan never called on him for payment. Plaintiff had a right to show a debt due to John Ryan. A debt may be shown in favor of one man against another by the latter's admission of its existence. John Ryan's administrator, in a suit against Ratliff, could show Ratliff's written admission or promissory note, or prove his oral admission of a debt. As an item or a step in the establishment of his demand, the plaintiff had right to establish the same point, namely, the existence of such debt from Ratliff to Ryan. Does the difference of parties preclude him from using the same evidence which could be used in the suit supposed? A declaration, though made by a stranger to the suit, may sometimes be used when the fact which it tends to establish is relevant to the case, and the declaration is against the interest of the party making it, and he is dead. Men do not falsely admit debts against themselves; and it is this presumption which induces the law to admit such a declaration. 1 Greenl. Ev. § 147.

The statement of this witness that as administrator of Ratliff he had never been called on for payment of the debt is not objectionable; but the statement that Ratliff told him that Sarah Ryan had demanded payment of the debt, and threatened to sue him, is improper. It may have prejudiced the defendant as proving a circumstance tending to show that Mrs. Ryan had collected the debt. Taking the whole case, should the verdict be set aside for that cause? The evidence

is clear that when John Ryan died he owned a considerable personal property, though no inventory of it was made. Shortly after his death his widow sold $500.00 of it. Shortly before his death he had some money. He and Sarah Ryan kept their money in two separate "pokes." A witness counted that in her poke at $200.00 but did not count that in his. His house consists of a front building of four rooms, and a back building, all pretty well furnished, there being seven beds, a set of chairs, cooking-stove, metal for kitchen, a cupboard filled with dishes, and a vast amount of bed-clothing, each one claiming a portion. Another witness says there were seventy two quilts and blankets. Ryan sold some cattle the year he died. He had three or four horses, three cows and left some cattle on the place. None of the furniture was included in the sale of the $500.00 worth made by the widow. A witness, Golden, proves that Ryan had this note on Ratliff and a debt on William Bumgardner. He speaks in his will of having money and bonds. Mrs. Ryan's appraisement bill is quite long, containing a great deal of furniture and other property, and notes, and foots up over $1,900.00. She carried on business some after his death, probably made something. On the whole, besides this $100.00 debt on Ratliff, and anything that could be allowed for chattels which would be consumed in the use, if any, there was clearly ample and abundant property to more than equal the amount of the verdict. Clearly so. This improper evidence could only tend to induce the jury to include this $100.00 debt on Ratliff in the property chargeable to Mrs Ryan, and therefore we say it might have entered into the verdict; but it touched only the amount of the verdict, and when we know by another witness that this debt existed, that she took charge of the whole estate, and that Ratliff, administrator, did not pay it, and further, especially, that she was chargeable with an amount of other property clearly sufficient to equal this verdict, it would seem improper to set it aside for that cause. *Hall* v. *Lyons,* 29 W. Va. 410, (1 S. E. Rep. 582); *Kerr* v. *Lunsford,* 31 W. Va. 66, (8 S. E. Rep. 493); *More* v. *City of Huntington,* 32 W. Va. —, (8 S. E. Rep. 512); *Taylor* v. *Railroad Co., supra,* p. 39 ; 4 Minor, Inst. 874.

From what has been said it follows that there is no error

in refusing to set aside the verdict because contrary to or without sufficient evidence. The judgment of the Circuit Court is affirmed, with damages and costs to the appellee.

.AFFIRMED.