Wright *vs*. Hicks,

No. 28.—Elias S. Wright, administrator of Jemima Culpepper, deceased, plaintiff in error, *vs.* Lewis F. Hicks, administrator of Daniel Culpepper, deceased, and administrator *de bonis non cum testamento annexo* of Daniel Culpepper, defendant in error.

[1.] The doctrine of adulterine bastardy, new in our Courts, and has fluctuated in England.

[2.] The law now is, that although the birth of a child, during wedlock, raises a presumption that such child is legitimate, yet that this presumption may be rebutted by evidence; and it is the duty of the Jury to weigh the evidence against the presumption, and to decide, as in the exercise of their judgment, the truth may appear to preponderate.

[3.] Either in a civil suit, or on a criminal prosecution, by the evidence of *non access*, or other testimony, the presumption of the legitimacy of the offspring, may be rebutted.

[4.] The same rules apply, whether the bastardy originates before or after marriage. In both cases, the law says, *presumptively*, it is the child of the husband.

[5.] The question of legitimacy may be made by any one whose right it is to contest it.

[6.] The heir at law can only be disinherited by express devise or necessary implication.

[7.] *Per Lord Eldon*, (1 *Ves. & Beame*, 466,) " With regard to that expression —*necessary implication*—it means not natural necessity, but so strong a probability of intention, that an intention contrary to that which is imputed to the testator, cannot be supposed."

[8.] The intention to disinherit the heir, is always necessary to raise an estate by implication.

[9.] Courts are not permitted to give effect to the will of the testator, contrary to the plain and obvious terms used by him, upon a mere *conjecture* as to his intention.

[10.] In the absence of anything in the will to the contrary, the law will presume that the testator intended his property to go where the law casts it ; and to disturb this natural course of descent, should require plain words to that effect.

[11.] If the estate is not devised to some other person, though the intention of the teststor be ever so manifest, to disinherit the heir, still the law casts the estate upon the heir. *Per Lord Mansfield and Mr. Justice Ashurst on Dem. ex dem. Goskin vs. Goskin, Cowper,* 657.

In Equity, in Crawford Superior Court. Demurrer, decided by Judge Powers. March Term, 1852.

The bill alleged, that in February, 1849, Daniel Culpepper departed this life, leaving a widow—Jemima Culpepper—surviving, and an estate worth five thousand dollars ; and, also, left a will, as follows :

"Item 1st. I give and bequeath unto my beloved wife, Jemima Culpepper, all my estate, both real and personal, during her natural life—after paying all my just debts—with the following reservations, to wit :

Item 2nd. I give and bequeath unto Berry Wesley Culpepper (so called,) five dollars out of any money belonging to my estate.

Wright *vs.* Hicks.

The said Berry Wesley Culpepper being the son of Elmira Culpepper, the wife of my only son, Isaiah Culpepper, deceased, and born in wedlock.

Item 3rd.   After the death of my wife, Jemima Culpepper, I reserve and bequeath $200 00, to be appropriated to the purpose of walling in the graves of myself and family, and the erection of head-stones, with an inscription, giving our births, marriages and ages, at the time of our death, not to cost more than thirty dollars each, the remainder to be applied to the erection of a strong and substantial wall around our graves.

Item 4th.   I appoint and leave my beloved wife my executrix."

The said Jemima qualified under the will, and took into possession the said estate.   Afterwards, to-wit: in the year 1849, the said Jemima departed this life, when Lewis F. Hicks applied for and obtained letters of administration generally, and letters of administration, with the will annexed, on the estate of Daniel Culpepper, and the complainant applied for and obtained letters of administration on the estate of Jemima Culpepper. Hicks took the said estate of Daniel Culpepper into possession.

The bill further alleges that Isaiah Culpepper, the son of Daniel and Jemima Culpepper, in 1835 or 1836, intermarried with one Elmira Sullivan, and the said Elmira, afterwards, to wit: in about the time of three months after said marriage, was delivered of a son.   That on the next day after the said intermarriage, the said Isaiah having discovered the imposition practised upon him—that is, the pregnancy of the said Elmira—returned her to her former home, and repudiated the said marriage, as far as he could do, protesting all the time against any knowledge or even suspicion of a want of chastity in the said Elmira."

The bill further alleged, that Isaiah Culpepper died before his father, Daniel Culpepper; and that Jemima Culpepper departed this life in the year 1847; that the said Berry Wesley Culpepper is now living; that Daniel Culpepper and Jemima Culpepper, both died, leaving no child or children, nor representatives of child or children.

The bill prayed that Hicks, the administrator of Daniel Cul-

pepper, might be decreed to deliver to the complainant, as the administrator of Jemima Culpepper, the entire amount of said property, for the reason that the same is the estate of the said Jemima, and not of the said Daniel Culpepper. Also, that the said Berry Wesley Culpepper might be decreed to be an illegitimate and not entitled to any portion of said estate.

To this bill a general demurrer was filed, which, after argument had thereon, was sustained by the Court, and the bill dismissed.

Which decision is assigned as error.

POE & HALL, for plaintiff in error.

G. R. HUNTER, for defendant in error.

*By the Court.*—LUMPKIN, J. delivering the opinion.

Berry Wesley Culpepper, the son of Isaiah Culpepper, and grand-son of Daniel and Jemima Culpepper, having been born in three months after the marriage of his parents, both of whom are dead, claims to be, the heir at law, through his reputed father, to his grand parents; and the first great question to be settled is, whether or not his legitimacy may be disputed, so as to exclude him from the inheritance? And if so, what are the principles of law applicable to the case ?

I need scarcely remark, that cases of *adulterine bastardy* are new in the Courts of this State. May the day be far distant, when our Courts shall be inundated with indecent and demoralizing investigations, as to whether the *husband* or *another*, be the father of children born within wedlock! Such inquiries cannot fail to contaminate the morals, and destroy the peace of society.

The doctrine upon this subject, has fluctuated greatly in England. The oldest law writers—Granville, Bracton, Fleta and Britton—seem to have considered that circumstantial evidence was admissible to counteract the maxim of the civil law—*Por-*

*ter est quem nuptiæ demonstrant*—or the presumption of legitimacy arising from the birth of the party within lawful wedlock.

But it appears from the year books, that rules of pleading were laid down by the English Courts, at an early period, the effect of which was to treat the *presumption* in favor of legitimacy as *conclusive*, unless it could be opposed by evidence of the husband's impotency; or of his being beyond seas, during the whole period of the wife's gestation.

And Lord Coke, in his Commentary on Littleton, lays it down, that, by the Common Law, if the husband be within the four seas, (that is, within the jurisdiction of the King of England,) and his wife have issue, no evidence is admissible to prove the child a bastard; except in the sole case of apparent impossibility of procreation by the husband, as of his not having attained the age of puberty. *Co. Litt.* 244, (*a.*) See, also, *Jenkins' Eight Centuries.* 10 *Regina vs. Murray.* 1 *Salk.* 122.

During the reigns which immediately followed, the presumption in favor of the legitimacy of a married woman's offspring, was strict and unyielding to an extreme ; whether, as has been supposed, from motives of policy, to protect the fruits of the profligacy of kings and nobles from the perils of disinheritance, I will not undertake to affirm.

It is hard to believe, at the middle of the nineteenth century, that there ever existed, in any enlightened country, a law so diametrically opposed to every principle of reason and common sense, as, that the children of a *married* woman should in *all* cases, be deemed legitimate, provided the husband was anywhere within the four seas which surrounded the island of Great Britain, and was endowed with generating potency.

And yet, to such an absurd length was the principle carried, that it was solemnly decided by a Court of the highest jurisdiction, that a child born in *England,* was legitimate, although it appeared on the fullest evidence that the husband resided in *Ireland* during the whole time of the wife's pregnancy, and for a long while previously, because *Ireland* was within the King's dominion.

In another instance, where the husband resided in *Cadiz,* the

child was held to be a bastard; not because *Cadiz* was at a greater distance, but because it was beyond the *four seas.*

In modern times, the severity of the "*quatuor maria*" rule has been done away with, and a doctrine adopted more conformable to the standard of reason and good sense, and more in accordance with what seems to have prevailed at the earliest period of the law. *Lord Raymond,* of virtuous memory, to his honor be it recorded, was the first Judge who had the courage, in 1732, in the case of *Pendrell vs. Pendrell* (2 *Strange,* 925,) to decide that the legal presumption of the husband's access might be controverted by other proof.

[2.] This opinion has been sanctioned by innumerable subsequent determinations, and the law now is universally understood to be clearly settled, that, although the birth of a child during wedlock, raises a presumption that such child is legitimate, yet, that this presumption may be rebutted, both by direct and presumptive evidence. And in arriving at a conclusion upon this subject, the Jury may not only take into their consideration proofs tending to show the physical impossibility of the child born in wedlock being legitimate, but they may decide the question of paternity, by attending to the relative situation of the parties, their habits of life, the evidence of conduct and of declarations connected with conduct, and to any induction which reason suggests, for determining upon the probabilities of the case. Where the husband and wife have had the opportunity of sexual intercourse, a very strong presumption arises that it must have taken place, and that the child in question is the fruit; but it is only a very strong presumption, and no more. This presumption may be rebutted by evidence, and it is the duty of the Jury to weigh the evidence against the presumption, and to decide, as in the exercise of their judgment, either may appear to preponderate. 5 *Phil. on Ev.* 6*th American from the* 9*th London edition, by Van Cott.* See also, the opinions of Lords *Eldon, Redesdale and Ellenborough,* in the case of the *Banbury Peerage.* The answers of the twelve Judges, in the same case.

Mr. *Mathew,* in his treatise on Presumptive Evidence, 22 *et sequitur,* says: The presumption in favor of legitimacy, still

Wright vs. Hicks.

holds, whenever it is not inconsistent with the facts of the case ; and it is right that it should. It results from the principles of natural justice ; it rests simply on the supposition of the virtuous conduct of the mother—a branch of that equitable rule which assumes the innocence of a party, until proof be brought of actual guilt. Yet, if such circumstances be in proof as clearly negative the truth of this presumption, the legal intendment will fail, and no general rule of evidence, of universal application, can be prescribed upon this subject. In every case, *the fact* must be determined by the particular circumstances.

Where the husband and wife reside at a distance from each other, so as to exclude the possibility of sexual intercourse, there it is admitted that the presumption of legitimacy is at once rebutted. But in the opinion of the Judges, in the *Banbury Peerage* case, a man and wife may dwell *in the same place,* and *in the same house,* and yet, under circumstances such as, instead of proving, tend to disprove, that any sexual intercourse took place between them.

So it has been laid down, that the presumption of access, by which is now meant sexual intercourse, though fortified by the strong fact of a private intercourse, is nevertheless open to rebuttal, by evidence of the feelings and conduct of the parties— such feelings and conduct as were displayed immediately before and after it.

And I apprehend, that a case might arise where mere proof of the fact of sexual intercourse, at or about the time of conception, would not be conclusive evidence of the legitimacy of the offspring. For instance—suppose that an adulterous connexion was shown to have existed between the wife and a *negro,* at or about the time when the child should have been begotten, and the color and other physiological developments of the offspring, demonstrated its African paternity, might it not be bastardized?

See *Harris Nicolas,* whose work on the law of *Adulterine Bastardy,* contains every authority and every case, published and unpublished, in its chronological order, which bears upon this subject ; maintains the correctness of Lord *Coke's* exposition of the law, and of its sound policy, at least, after it became so far

VOL. XII 21

modified as to abandon the rule of the "*quotuor maria*," while it required evidence of the *absolute impossibility* of the husband's being the father of his wife's child, *from whatever cause that impossibility might arise,* instead of making the *impossibility* depend upon corporeal infirmity or geographical limits.

And it must be admitted that such a rule has this to recommend it : it is clear, certain, positive, intelligible and well-defined; and it would seem to have the sanction of the Supreme Court of the United States, as we gather from one of the *head notes* to the report of the celebrated case of *Patterson vs. Gaines* and *Wife,* 6 *Howard,* 550." " If the fact of marriage be proved, nothing can impugn the legitimacy of the issue, short of the proof of facts, showing it to be impossible that the husband could be the father."

I have looked carefully through the opinion of the Court, delivered in this case, without being able to deduce this proposition as strongly and definitely as it is here stated.

[3.] We adhere however, to the opinion already intimated, and such is our determination, that marriage is to be regarded in no other light than presumptive proof that the husband is the father of all the children born during wedlock, or within a competent time afterwards ; that either in a civil suit, or on a criminal prosecution, by the evidence of *non access,* or other testimony, the presumption of the legitimacy of the offspring may be rebutted.

[4.] That the same rules apply, whether the bastardy originates before or during marriage. If a man marries a woman pregnant by *another person,* the law presumes the child to be the husband's; and whether she was a reputed virgin or *grossment ensient,* the books make no distinction. In both cases, the law says it is presumptively his child; still he may show by whatever proof he may command, that he has been made the innocent victim of fraud and artifice.

[5.] And the same proof may be adduced by any one, whose interest and right it is to contest the legitimacy of the pretender; and inexpressibly hard would it be if such privilege was not allowed. It is repugnant to the feelings of every man, that his

Wright *vs.* Hicks.

property, upon his demise, should descend through channels where his blood did not flow ; channels too, tainted and corrupted by the grossest impurity.

[6.] The other main question made by the record is, whether Mrs. Jemima Culpepper took a life estate only, in the property of her deceased husband ? or, whether she is entitled, together with her reputed grandson, Berry Wesley Culpepper, as heirs at law, of Daniel Culpepper, to the fee ?

[7.] We take these principles to be well settled, namely : That the heir at law can only be disinherited by express devise or necessary implication ; and that implication has been defined to be such a strong probability, that an intention to the contrary cannot be supposed. 1 *Jarman on Wills*, 466, and the authorities cited.

[8.] And, that the intention to disinherit the heir is always necessary to raise an estate by implication. *Ibid, note.* That devises, by implication, are sustainable only, upon the principle of carrying into effect the intention of the testator ; and unless it appears upon an examination of the whole will, that such must have been his intention, there is no devise by implication. *Ibid,* (3 *note.*)

[9.] And, lastly, that Courts are not permitted to give effect to the will of the testator, contrary to the plain and obvious terms used by him, upon a mere conjecture as to his intention. *Maniganet vs. Deas*, 1 *Bail. Eq.* 298.

[10.] Again, in the absence of anything in the will to the contrary, the presumption is, that the ancestor intended that his property should go where the law carries it, which is supposed to be the channel of natural descent. To interrupt or disturb this descent, or direct it in a different course, should require plain words to that effect.

[11.] If the estate is not devised to some other person, though the intention of the testator be ever so manifest to disinherit the heir, still the law casts the estate upon the heir. *Denn vs. Larkin, Cowper,* 657. This was a devise of a freehold estate, to three nephews, without words of inheritance ; a legacy of ten shillings to the heir at law, and after some other lega-

cies, the residue of the personal estate to the nephews.    It was held that the nephews took only a life estate in the lands, and the heir at law, the fee—the intention to disinherit him, being wanting, it could only be inferred, from a vulgar notion, that a small legacy was evidence of such an intention, which Lord *Mansfield* held to be insufficient.

In *Howell vs. Barnes* (*Cro. Car.* 382,) an estate was devised to A. for life, and after death, ordering her executors to sell and divide the proceeds.    It was held, that the intention to disinherit the heir was wanting, notwithstanding the executors had authority to sell and divide the proceeds.

In *Schanber vs. Jackson, ex. dem. Bogert and others,* (2 *Wend.* 13,) this whole doctrine underwent a most searching examination.    There, the testator bequeathed to his son, *Simon,* who was the heir at law, 20 shillings for his birthright, to be raised and levied out of his estate, "*wherewith he utterly excludes, debars and excludes him from having or claiming any other, or further pretensions, claims and demands whatever, as being his heir at law, or by any other pretence whatever.*"    He then bequeaths certain articles of personal property to his other children, and twenty-five pounds to his son Johannes, to be raised out of moneys arising from his real and personal estate.    He then authorizes and empowers, orders and directs his executors to sell and dispose his whole real and personal estate, as well in New York as elsewhere, (except the personal estate before bequeathed) either at public or private sale, and declares their conveyance valid and effectual to convey all his estate.  He directs the money arising from such sale to be applied, first, to pay the legacies, and the balance to be divided; one-fifth to each of his sons, Simon and Johannes; one-fifth to each of his daughters, Maddalena and Engeltze, and one-fifth to his grand-son, Jacobus Berry, the share of his grandson to be retained till his maturity or marriage, in the hands of his executors, and in case of his death, to be divided among the four children above named.    He then appoints his son Johannes, and daughter, Engeltze, executors of his will.    Engeltze filed her renunciation as executrix, and the will was proven, and letters testamentary granted to Johannes.

According to the English law, in force at the time of the death of William Appel, the testator, his oldest son, Simon, would have been entitled by right of *primogeniture*, to the estate in question, as heir of his father, unless the descent was broken by, or under the provisions of this will.

The only question made in the Court of errors, was—whether by the will, any part of the legal estate was devised to the *executors;* or, whether they had a naked power to sell only, and distribute the proceeds?

The Supreme Court decided, that there being no direct devise, either to the children or to the executors, there was nothing to prevent the descent of the estate to the heir at law.   And the Chancellor, together with *nine* Senators, voted for *affirming* the judgment—*twelve* Senators for reversal.   *Stebbins*, one of the majority, argued the question at great length, and with much ability, and he concedes "that, had the will stopped after declaring that Simon, the heir, should not take the estate, he would, nevertheless, have taken, *because it would have been given to no other person.*"

Here, there are no words of exclusion in the will, of the heirs at law; neither is the inheritance given to any other person. Of course, the fee is cast upon them by descent.

Let us next apply these principles to the pleadings, and see whether there was error in dismissing the complainant's bill.

It is brought by Elias S. Wright, as administrator of Jemima Culpepper, deceased, against Lewis F. Hicks, as administrator generally, and also, as administrator *de bonis non cum testamento annexo* of Daniel Culpepper, deceased, to recover the residue of the estate of said Daniel, out of the hands of the defendant.   It seeks a decree for the *whole surplus*, upon the ground that the ostensible co-heir, to wit: Berry Wesley Culpepper, was an illegitimate.

Were the allegations in the bill—admitting them to be true—sufficient to bastardize this boy?   We think not.   The bill does not even expressly charge the illegitimacy of Berry Wesley Culpepper, which it should do, and that notwithstanding he was born within three months after wedlock, that no sexual inter-

course had ever been had or taken place between the said Isaiah Culpepper and his mother, previous to their marriage.

The order of the Court, dismissing the bill, was manifestly wrong, admitting that the averments were insufficient, as to the bastardy. It should have been returned at least for the purpose of enabling the administrator of old Mrs. Culpepper, to secure from the defendant, the moiety of the estate coming to his intestate.

Consequently, the bill must be re-instated, with leave to amend in the particulars indicated.

I regret sincerely, that the Reporter is forbidden to publish *in extenso*, the argument submitted by Robert P. Hall, Esquire, in this case. It would constitute an abiding monument of his ability and research, and deserves to be preserved in an enduring form.