ROSE BEAL, ETC.

*vs.*

JAMES E. ROSS

Court of Common Pleas    Fairfield County    File No. 43399

MEMORANDUM FILED DECEMBER 23, 1942.

*Samuel Engelman,* of Bridgeport, for the Plaintiff.

*David R. Lessler,* of Bridgeport, for the Defendant.

Memorandum of decision in bastardy proceeding.

CULLINAN, J. This is an action under our bastardy statute. (Gen. Stat. [1930] §5867, as amd.) The plaintiff, a married woman separated from her husband, alleges that on September 5, 1942, a son was born to her as the result of her cohabitation with the defendant, a married man separated from his wife.

In preliminary proceedings, conducted before a justice of the peace, probable cause to support the plaintiff's claim of pregnancy was found to exist, and the defendant was ordered

to appear before the Court of Common Pleas for Fairfield County at its session commencing on the first Tuesday of May, 1942.

The matter was assigned for disposition on Wednesday, November 4, 1942, when the defendant appeared in court with counsel. To the plaintiff's complaint, the defendant, acting through counsel, said "not guilty." Thereupon it was learned that the plaintiff was not present in court, although she was represented by counsel. By agreement the matter was continued until Tuesday, November 24, 1942, when, it was represented to the court, both the plaintiff and the defendant would be prepared to proceed to trial.

On November 24, 1942, the plaintiff appeared with counsel. However, the defendant was absent although his attorney was in attendance. Since the plaintiff had journeyed a considerable distance to be present, it was agreed by all parties that her evidence might be received. During the course of her testimony, it developed that the plaintiff had been in the City of Bridgeport on the date of the previous assignment (November 4, 1942); that she had met the defendant on a public street; that they had engaged in conversation; and that he had requested her not to appear in court, promising he would amicably settle the matter and arrange to support the child, claimed to have been born to the plaintiff as a result of her cohabitation with him. In view of the defendant's apparent sincerity and persuasiveness, the plaintiff failed to appear to meet the original assignment of her action.

At the conclusion of the proceedings of November 24, 1942, counsel for the defendant was instructed to make every reasonable effort to have his client before the court on Tuesday, December 1, 1942. On this date the defendant failed to appear and the matter was adjourned until Tuesday, December 8, 1942, when further evidence was received from the plaintiff. It should be noted that again the defendant failed to appear, although he had been seasonably notified of the course which the entire matter was following.

Following adjournment of court on December 8, 1942, counsel for the defendant received a special delivery letter from his client wherein he promised to be present in court on Tuesday, December 15, 1942. Needless to say the defendant failed to appear on that date.

The foregoing facts have been detailed to portray the com-

plete bad faith, unreliability and untrustworthiness of the defendant. However, it should be observed that his counsel was, at all times, sincere and cooperative in his attempts to have the defendant before the court.

The plaintiff was legally married on July 18, 1941. Thereafter she lived with her husband until mid-August, 1941, when they separated. Their marital relations were resumed on September 27, 1941, and final and complete separation occurred on October 29, 1941, whereupon she took up immediate residence with the defendant.

The plaintiff claims that final cohabitation with her husband occurred on October third or fourth, 1941, and that thereafter she ceased having marital relations with him although they continued to live together, intermittently, until the date of final separation, October 29, 1941.

On October 28, 1941, the day preceding the plaintiff's final separation from her husband, she and the defendant motored to Pennsylvania, indulged in sexual intercourse, and returned to Connecticut in the early morning hours of October 29, 1941. At this point the plaintiff removed her personal belongings to the defendant's rooming quarters and continued to reside with him until February 28, 1942, when separation occurred. Throughout this period, the plaintiff and defendant were intimate on many occasions. It is the plaintiff's claim that she became pregnant on or about November 28, 1941, and that this pregnancy resulted from her sexual relations with the defendant. Early in December, 1941, when the plaintiff became aware of her condition of pregnancy, she discussed the matter with the defendant who immediately said "he would like to have a baby" and that "he was proud."

This narrative by the plaintiff constitutes a sordid and shocking tale of marital infidelity and sexual promiscuity. Likewise, could there be any more convincing evidence of an illicit relationship embracing "what men call gallantry and gods adultery." However, the genuine tragedy lies not in the indiscretions, irregularities and illegalities of the mother and claimed father, but in the birth of "the child of misery" under the most appalling and degrading circumstances.

To supplement the claims of the plaintiff concerning the paternity of her child, there is before the court a series of letters written to the plaintiff by the defendant and addressed to

"Mrs. James Ross", wherein the defendant expresses the hope that "I can find an apartment soon and you and the baby can come down here"; wherein he evinces concern for "you and the baby"; wherein he bemoans his fate because "I can't find a place to live. Everyone I ask says 'Yes' until I tell them we have a baby"; and wherein he expresses the hypocritically tender sentiment "I love you and miss you. Say 'hello' to Jim, Jr., for me." Furthermore, several of these letters enclosed money for the apparent support of the plaintiff.

To this cumulative evidence, pointing unmistakably to the guilt of the defendant, his counsel, by way of defense, has suggested the presumption that a child born to a married woman during wedlock is the child of her husband and legitimate. *Hubert vs. Cloutier,* 135 Me. 230, 194 Atl. 303.

While it must be conceded that this presumption is one of the most persuasive known to the law (*Matter of Matthews,* 153 N.Y. 443, 47 N.E. 901), yet "by and large....the courts are generally agreed that countervailing evidence may shatter the presumption....Issue will not be bastardized as the outcome of a choice between nicely balanced probabilities....They will not be held legitimate by a sacrifice of probabilities in a futile quest for certainty." (*Matter of Findlay,* 253 N.Y. 1, 8, 170 N.E. 471, 473.)

To be sure, English courts once adopted rules of pleading whereby the presumption of legitimacy of a child born to a married woman during wedlock was to be regarded as *absolutely conclusive* unless it could be opposed by evidence of the husband's sexual impotency, or of his being beyond the four seas, that is, outside the jurisdiction of the King of England, during the entire period of the wife's gestation.

This principle was carried to such fantastically absurd extremes that it was once decided that a child born in England was legitimate, although it appeared by highly credible evidence that the husband resided in Ireland during the entire period of the wife's pregnancy, and for a considerable period prior thereto. This unwholesome result was achieved solely because Ireland was within the dominion of the King of England. In another instance, where the husband resided in Cadiz, the child was held illegitimate, not because Cadiz was at a greater distance but because it was beyond the four seas.

The harshness of this so-called "four seas" or "Quatuor Maria" rule was ultimately meliorated by English and Ameri-

can courts and the law now appears to be, in the light of many authorities considered, that although the birth of a child, during wedlock, raises a presumption that such child is legitimate, nevertheless this presumption may be rebutted by both direct and presumptive evidence. And in drawing a final conclusion on the subject I feel justified not only in analyzing physical facts but also "the relative situation of the parties, their habits of life, the evidence of conduct and of declarations connected with conduct, and....any induction which reason suggests, for determining upon the probabilities of the case." (*Wright vs. Hicks*, 12 Ga. 155, 160.)

I am satisfied that the plaintiff's marital relations with her husband terminated on October third or fourth, 1941; that her relations with the defendant commenced on October 28, 1941, continuing down to February, 1942; that the plaintiff became pregnant on or about November 28, 1941; that the plaintiff's pregnancy resulted from her relations with the defendant; that the defendant has at all times recognized himself as the father of the plaintiff's child; and that his conduct, evidenced both by the written and spoken word, clearly points him to be the father of the plaintiff's child.

The court finds the defendant guilty and orders him to stand charged with the maintenance of said child with the assistance of the mother. The court finds the lying-in expense and the expense of maintaining the child to date to be $214. The court orders the defendant to pay $107 to the complainant, to pay the costs of court, and to pay the complainant $5 per week from December 23, 1942, until such time as the child attains the age of 16 years. The court further orders the defendant with sufficient surety to give bond in the sum of $1,500 to perform said order.