31317.   COLSON *v.* HUBER.

DECIDED SEPTEMBER 10, 1946.   REHEARING DENIED OCTOBER 3, 1946.

342

*William H. Riddlespurger, C. E. Hay,* for plaintiff.
*Hoyt H. Whelchel, John T. Coyle,* for defendant.

GARDNER, J. Counsel for the plaintiff in their argument cite and rely on the provisions of the Code, §§ 74-201, 74-202. Section 74-201 reads: "An illegitimate child, or bastard, is a child born out of wedlock, and whose parents do not subsequently intermarry, or a child the issue of adulterous intercourse of the wife during wedlock, or a child who is not legitimate within the meaning of § 74-101."

Section 74-202 reads: "The father of an illegitimate child shall be bound to maintain him. This obligation shall be good consideration to support a contract by him. He may voluntarily discharge his duty; if he shall fail or refuse to do it, the law will compel him."

The first of these two sections defines what children are illegitimate. The second section deals with the obligation of the father to support such illegitimate children. We might in this connection call attention to the provisions of § 74-101, which deals with

the question of what children are legitimate, the presumption of legitimacy, and legitimation by marriage of parents. That section reads: "All children born in wedlock, or within the usual period of gestation thereafter, are legitimate. The legitimacy of a child thus born may be disputed. Where possibility of access exists, except in cases of divorce from bed and board, the strong presumption is in favor of legitimacy, and the proof should be clear to establish the contrary. If pregnancy existed at the time of the marriage, and a divorce is sought and obtained on that ground, the child, though born in wedlock, is not legitimate. The marriage of the mother and reputed father of an illegitimate child, and the recognition of such child as his, shall render the child legitimate; and in such case the child shall immediately take the surname of his father."

We also call attention to the Code, § 74-105, which deals with the obligation of a father to support his legitimate child, which reads: "Until majority, it is the duty of the father to provide for the maintenance, protection, and education of his child."

Thus it will be seen that the two sections of the Code, cited by counsel for the plaintiff in error, deal with illegitimate children and the duty of the father to support them, while the other two sections deal with legitimate children and the duty which their father owes them. Counsel for the plaintiff in error cite a number of decisions of the Supreme Court and of this court in support of the allegations of the petition. The cases cited are: *Wright v. Hicks,* 12 *Ga.* 155 (4) (56 Am. D. 451) ; *Hargroves* v. *Freeman,* 12 *Ga.* 342 ; *Davis* v. *Moody,* 15 *Ga.* 175 ; *Jackson* v. *Finney,* 33 *Ga.* 512 ; *Nixon* v. *Perry,* 77 *Ga.* 530 (3 S. E. 253) ; *McLoud* v. *State,* 122 *Ga.* 393 (2) (50 S. E. 145) ; *Jones* v. *State,* 11 *Ga. App.* 760 (76 S. E. 72) ; *Franklin* v. *Ford,* 13 *Ga. App.* 469 (79 S. E. 366) ; *Francis* v. *Barnwell,* 25 *Ga. App.* 798 (105 S. E. 165) ; *Morris* v. *Dilbeck,* 71 *Ga. App.* 470 (31 S. E. 2d, 93). The first Supreme Court case cited by the plaintiff, *Wright* v. *Hicks,* supra, was again before the Supreme Court in *Wright* v. *Hicks,* 15 *Ga.* 160 (60 Am. D. 687). We have read carefully all these decisions and many more on the question before us. Without discussing in detail the facts and principles of law involved and decided in not only the cases cited but in all other cases of our appellate courts which we have read, we find that they deal with two questions: (1) the

right of the legitimate lineal descendants of the father to contest the right of an alleged illegitimate child, even though born in wedlock, to inherit from the father, on the ground that, being an illegitimate child as to the father, such illegitimate child could not inherit from the father; and (2) the right of a mother to enforce a contract made with the putative father to support the child born out of wedlock. It does not appear, under the facts of any of the cases in the latter class of decisions, that the mother of a child presumed to be legitimate ever received judicial sanction to bastardize her own child which was born during coverture. The provisions of the statute which we have above quoted, with reference to the illegitimacy of a child resulting from adulterous intercourse, have been applied only to the rules of inheritance; and the legal obligations of the father of an illegitimate child to support it, so far as the decisions show, have been applied only to the father of an illegitimate child, the mother of whom was not living with her husband during the period of gestation and birth of the child. The rule of law set forth in bastardy proceedings under our Code, Chapter 74-3, is founded upon the principle that the illegitimate child may become a charge on the public, and is designed primarily as a means to force the father of such illegitimate child to support it. The bastardy laws are not, as able counsel for the plaintiff contend, based on the principle of the welfare of the child. The State makes a large outlay of investment in eleemosynary institutions to look to the welfare of unfortunate children. So do our religious institutions, which are in finality the public; and private individuals as well are concerned in order to insure that no such unfortunate child shall be condemned to starvation. To this end the law also provides that even the custody of such children may be taken from the father and mother and placed where the child will receive the most benefit. But this is not under consideration. On this point what we mean to say is that the following enthusiastic argument of counsel for the plaintiff is erroneous and has no application to the facts of this case. That argument is: "Whatever the law may now be in other States, whatever it may once have been in England, it is certain that the statute law of Georgia now looks, and has long looked, primarily to the welfare of the child, never condemns a bastard to starvation, never penalizes any child for the sins of its father or its mother, and never relieves the

father of his moral obligation to support his illegitimate child, but rather gives to that moral obligation the binding and compelling force of emphatic statutes."

As stated above, we have been unable to find any case where there has been judicial approval of arrangements such as the allegations of this petition show. We do find, however, decisions that an arrangement of this kind can not have judicial approval under the principle of public policy. We find one case the facts of which are almost on all fours with this one, from a court of a State which stands high in judicial respectability. That case is Flint v. Pierce, 136 N. Y. Supp. 1056. Before we quote from this decision and comment upon it, we desire first to quote from annotations in 39 A. L. R. 446 (c): "A promise by the father of an illegitimate child to provide for the child, which rests partly or wholly on the consideration of future illicit intercourse with the mother, is contrary to public policy and void. Steele v. Crawford (1923) 197 Ky. 798 (248 S. W. 197); Trovinger v. M'Burney (1825) 5 Cow. (N. Y.) 253; Crawford v. Gordon (1883) 9 Ohio Dec. Reprint, 160.

"Likewise, it has been held that an agreement with plaintiff, made in part as an inducement to her to enter upon a career of illicit intercourse with the defendant, to allow her a liberal sum of money for the support and maintenance of a child which he desired her to bear him, is invalid as against public morals. Randolph v. Stokes (1908), 125 App. Div. 679 (110 N. Y. Supp. 20).

"And merely because the mother did not in fact cohabit with the father after the making of an agreement between them for the support of their illegitimate child, based partly on the consideration that the mother would continue to cohabit with the father, makes no difference, as it is the making as well as the performance of the agreement that the law abhors. Crawford v. Gordon (Ohio) supra.

"So, a promise by the putative father to pay for the board of a woman and her bastard child is void if the purpose of the parties, expressly or tacitly, was to facilitate a continued state of cohabitation between the promisor and the woman, although knowledge of the promisee of the previous cohabitation between the promisor and the woman is not a fact from which it could be inferred that the

purpose of the contract was to facilitate future cohabitation. Trovinger v. M'Burney (1825) 5 Cow. (N. Y.) 253, supra."

Again reverting to Flint v. Pierce, supra, we quote from the opinion, page 1058: "(2, 3.) The fact that any person was born during the continuance of a valid marriage between his mother and any man is conclusive proof that he is the legitimate child of his mother's husband, unless it can be shown that his mother and her husband had no access to each other at any time when he could have been begotten; regard being had both to the date of the birth and to the physical condition of the husband. Cross v. Cross, 3 Paige 139 (23 Am. D. 778); Van Aernam v. Van Aernam, 1 Barb. Ch. 375; Caujolle v. Ferrie, 23 N. Y. 90; 1 Greenleaf, § 28. All authorities agree that the plaintiff would be incompetent to establish non-access of her husband." Division 4 of the same opinion reads: "No authority has been cited or found that bears on the question presented. Cases of divorce or actions by unmarried women are of no aid in solving the problem; bastardy proceedings instituted by poor authorities are of no help; decisions that the promise by a putative father of an illegitimate to pay for its support can be enforced are of no avail. Because it has been held that a woman unmarried at the time of the birth of her illegitimate child can enforce the agreement to support it, furnishes no reason for holding that a married woman can enforce an agreement made by the putative father to support her child born during wedlock. All the cases cited are claims, actions, proceedings, etc., by single women to enforce agreements against putative fathers of their illegitimate children, or bastardy proceedings brought by poor authorities, or divorce cases. They are all based upon some statute or founded upon contract the enforcement of which does not offend public policy. The right of a married woman to bastardize her own child born in lawful wedlock, and thus violate good morals, domestic decency, respectability of married life, security of the home, and the sacredness of marital motherhood, was not involved. A single woman has no husband to support her children; she has no husband to support herself; she has no claims upon the father of her children for her own support. The agreement of a father to pay a single woman for the care and support of their child does not infringe upon the rights of any husband. To say that a married woman may enjoy the marital obligation of her husband to support

herself and her children and at the same time compel a paramour to perform his agreement to pay her $30 a month during her lifetime for the support of a child alleged to have been begotten by the paramour during wedlock with her husband, is pretty nearly saying that a woman may have two husbands and compel them both to support her; it is saying that a woman may compel two men to support her, one because of a marriage ceremony, and another because her violation of those marriage-vows has furnished a good consideration for some other man's promise to support her. For 23 years after the birth of the alleged illegitimate this plaintiff had a husband who under the law and the admitted facts was bound to support her. He died in 1896 her lawful husband. It is now 39 years since the birth of the child that for that time has been presumed to be the legitimate son of the plaintiff and her husband, Alonzo Flint. The name Howard Flint was given to their son by plaintiff and her husband. To permit the enforcement of this alleged contract under the circumstances is so shocking to good morals and decency that it should be done only by the compelling force of well-recognized authority.

"In the absence of such precedent, the conclusion is reached that good morals and public policy forbid that plaintiff be permitted to assert the illegitimacy of her son, born in lawful wedlock, to furnish an alleged consideration for the contract sued upon; that the legitimacy of her own son is so conclusively presumed that she can not rebut it and thereby secure a cause of action."

The most pertinent and direct application of the opinion in this case, as it applies to the allegations of the instant case and the law of our State, is the fourth division of the opinion (part of which we have quoted above) and headnote 4 thereon. We quote headnote 4: "The mother of a child born during wedlock is precluded by public policy from asserting its illegitimacy to show consideration for a contract with a man other than her husband, providing for the payment of a certain monthly sum for its support." We will not quote the entire opinion in division 4 of that case, but we do invite attention to it, and particularly to the part quoted hereinbefore. The facts in Flint v. Pierce, will be found almost on all fours with the facts in the case at bar, the main difference being the difference in the period of time between the beginning of the illicit arrangements and the time thereafter when suit was in-

348

stituted by the mother against the putative father. In the Flint case such time was 39 years, and in the instant case 13 years.

While we have above set forth the allegations of the petition, we wish in this connection to call specific attention to the allegations in paragraph 2 that one of the illegitimate children was born on November 4, 1933, and the other one on June 23, 1935; also, to the allegations in paragraph 8 of the petition that the defendant began to make improper advances toward the plaintiff within two weeks after she had met him and she and her husband and other members of the family had rented a house from him; and that the plaintiff continued to live with her husband in the house until his death on December 7, 1940. The petition further reveals that the plaintiff with her family moved into the defendant's house in July, 1931, and the illicit arrangements of the plaintiff and the defendant were consummated in September of the same year; and that she continued this immoral arrangement with the defendant until May, 1944, during a period of nine years while the plaintiff was living with her husband, and approximately four years after her husband's death, the relations ending in the early part of May, 1944, when the defendant became ill.

Admitting all allegations of the petition which are well pleaded, the law requires that the petition be construed most strongly against the plaintiff. In this view, the arrangement on the part of the plaintiff shows only an arrangement of continuing meretricious traffic in the privacy of her person and the virtues and fidelity of her home while living with her husband, and then four years after her husband's death, seeking for a monetary price to bastardize her two children and take from them their good name. It is our confirmed opinion that the law was never intended to sanction such a situation, nor will good morals and public policy permit approval by the courts. The prosecution for bastardy or a consideration from the putative father to the mother of the illegitimate child for support is held to be based upon a valuable consideration and enforceable. This is quite a different thing from a promise to pay for future and continuing immoral relations with a married woman living with her husband.

The court did not err in sustaining the demurrer to the petition for any of the reasons assigned.

*Judgment affirmed. Broyles, C. J., and MacIntyre, J., concur.*