42104.   GIBBONS et al. v. MARYLAND CASUALTY
COMPANY et al.

ARGUED JUNE 7, 1966—DECIDED DECEMBER 2, 1966—REHEARING
DENIED DECEMBER 15, 1966—

*Donald E. Austin,* for appellants.

*Corish, Smith & Remler, Julian F. Corish, Malberry Smith,*
for appellees.

PER CURIAM. Thomas Gibbons, an employee of Savannah
Sugar Refining Corporation, sustained an accidental injury on
July 20, 1962, which arose out of and in the course of his
employment. That injury resulted in his death on July 28,
1962. Dorothy Gibbons, his widow, for herself and for the
minor children of Thomas Gibbons, filed a claim with the
State Board of Workmen's Compensation against the employer
and its insurer. On the hearing before the deputy director,
employment, wage rate, injury arising out of the employment,
and death resulting therefrom being admitted by the employer,
the sole issue presented by the evidence was whether the widow
and the children involved were dependents of Thomas Gibbons
within the meaning and requirements of the Workmen's Com-
pensation Act.

■ With respect to the widow, the evidence showed without dispute that she and the deceased employee were united by a ceremonial marriage performed pursuant to license on April 25, 1943; that they thereafter lived together as, and held themselves out to be, husband and wife; and that there were born during the period of their cohabitation two children, one of whom, Jesse, was at the time of the death of the employee a minor dependent upon him for support. With respect to this latter named child there is, and there can be, no dispute as to his right to share in the award of compensation entered on account of the death of Thomas Gibbons. We shall therefore pass to other matters about which there is dispute and the solution of which is somewhat more doubtful.

■ "The following persons shall be conclusively presumed to be the next of kin wholly dependent for support upon the deceased employee: (a) A wife upon a husband whom she had not voluntarily deserted or abandoned at the time of the accident." *Code* § 114-414. As stated above, Dorothy Gibbons and Thomas Gibbons had duly entered into a solemnized marriage and had lived together as man and wife. No evidence was offered in any way tending to suggest that this marriage had ever been legally dissolved. The evidence did show, however, that for about fifteen years preceding his death Thomas Gibbons had lived in Savannah and she in McKeesport, Pa. Thus with respect to Dorothy Gibbons the issue revolved around whether she had voluntarily deserted or abandoned the employee at the time of the accident. The deputy director found that the evidence did not show that the separation was a desertion or voluntary abandonment on her part. It is not contended that this finding was the result of any misapprehension on the part of the deputy director of any rule of law. Therefore, under well recognized principles, if this finding was in any way supported by the evidence, the judge of the superior court was not authorized to set it aside.

Dorothy Gibbons was the sole witness in the case. She testified both by deposition and in person at a hearing held before the deputy director. On both occasions she testified that the cause of the separation was that Thomas never prepared a

place for them to live, that they had to live either at his mother's house or at her mother's house, and that they had "big in-law trouble." She testified in effect that she had asked him on several occasions to provide her with a place to live separate and apart from the families, but that his parents always told him what to do and he did what they said to do, and that when they were living with her parents he went back and lived with his parents at a time when she was 2 or 3 months pregnant with Jesse. This was clearly sufficient evidence to authorize the deputy director to enter the award in favor of Dorothy Gibbons, the widow, even though there may have been evidence of probative value authorizing a contrary conclusion. On the other hand, there was no evidence, of probative value or otherwise, tending in any way to show that Dorothy Gibbons ever contracted a bigamous marriage. The evidence here in this regard, if it be of probative value to show anything, shows merely that Dorothy Gibbons repeatedly indulged in acts of adultery with various and sundry individuals after her separation from Thomas Gibbons. Such evidence standing alone is clearly insufficient to authorize a finding charging her with abandonment of Thomas Gibbons, and it follows that the judge of the superior court erred in setting aside the award of compensation to Dorothy Gibbons.

■ The deputy director found that after Dorothy Gibbons separated from Thomas Gibbons she bore five other children; that Thomas Gibbons was not the father of any of these five children; that in fact the testimony shows that each of the five children had a different father. As previously indicated, the oldest child, Nathaniel Gibbons, was over 18 years of age at the time of his father's death and was therefore not a dependent entitled to compensation. Jesse Gibbons, whom the evidence showed without dispute to be the child of Thomas Gibbons, was at the time of the accident under the age of 18, and, based on findings in accordance with this undisputed evidence, the deputy director awarded compensation to Dorothy Gibbons at the rate of $25.50 per week for the use and benefit of herself and the minor child, Jesse Gibbons, said compensation to be paid for a period not to exceed 400 weeks. The employer and

insurer appealed to the superior court on the ground that there was not sufficient competent evidence in the record to warrant the board in making the award and on the ground that the award was contrary to law. Abraham Brown (so named by his mother), Donnatha Gibbons, Reginald Gibbons, Howard Gibbons, and Leonard Gibbons, the remaining minor children of Dorothy Gibbons, also appealed to the superior court contending that the award was erroneous insofar as it denied them compensation because there was not sufficient competent evidence in the record to authorize the order and decree of November 5, 1965, and because the order was contrary to law.

As previously stated, Dorothy Gibbons was the sole witness for the claimants. All of the evidence came from her lips, either in the form of her testimony given orally on the hearing before the deputy director or in her deposition, or indirectly by way of information furnished by her to authorities to enable the preparation of birth certificates for her children. She was permitted to testify over objection, and the deputy director apparently gave credence to such testimony, that, with respect to each of the minor children who are appellants here, the father was one other than Thomas Gibbons. If this testimony constituted competent evidence, the award was authorized. If it did not constitute competent evidence insofar as the award denied compensation to these minor claimants, it was unauthorized.

The law as presently embodied in *Code* § 74-101, appears to have been first pronounced in Georgia in *Wright v. Hicks,* 12 Ga. 155 (2) (56 AD 451). On page 160, the court said: "The law now is universally understood to be clearly settled, that, although the birth of a child during wedlock, raises a presumption that such child is legitimate, yet, that this presumption may be rebutted, both by direct and presumptive evidence. And in arriving at a conclusion upon this subject, the jury may not only take into their consideration proofs tending to show the physical impossibility of the child born in wedlock being legitimate, but they may decide the question of paternity, by attending to the relative situation of the parties, their habits of life, the evidence of conduct and of declarations connected

with conduct, and to any induction which reason suggests, for determining upon the probabilities of the case. Where the husband and wife have had the opportunity of sexual intercourse, a very strong presumption arises that it must have taken place, and that the child in question is the fruit; but it is only a very strong presumption, and no more. This presumption may be rebutted by evidence, and it is the duty of the jury to weigh the evidence against the presumption, and to decide, as in the exercise of their judgment, either may appear to preponderate. . . . The presumption in favor of legitimacy, still holds, whenever it is not inconsistent with the facts of the case; and it is right that it should. It results from the principles of natural justice; it rests simply on the supposition of the virtuous conduct of the mother—a branch of that equitable rule which assumes the innocence of a party, until proof be brought of actual guilt. Yet, if such circumstances be in proof as clearly negative the truth of this presumption, the legal intendment will fail, and no general rule of evidence, of universal application, can be prescribed upon this subject. In every case, *the fact* must be determined by the particular circumstances. Where the husband and wife reside at a distance from each other, so as to exclude the possibility of sexual intercourse, there it is admitted that the presumption of legitimacy is at once rebutted." This ruling of the Supreme Court was first codified as § 1736 and § 1737 of the Code of 1861 (1863), and is now embodied in substance in the 1933 Code as § 74-101. It doubtless has been reiterated in cases too numerous to cite, but see for example, *Sullivan v. Hugly,* 32 Ga. 316, and the comparatively recent cases of *Ellis v. Woods,* 214 Ga. 105, 108 (103 SE2d 297), and *Stephens v. State,* 80 Ga. App. 823, 825 (57 SE2d 493), where this rule was quoted and applied.

While it is obvious from the language employed by the Supreme Court in the *Wright* case, 12 Ga. 155, supra, that the presumption of legitimacy, though a very strong one, is not conclusive, and this presumption may be overcome by evidence showing, inter alia, the habits of life and relative situations of the parties, their conduct and declarations connected with conduct, such as, for example, in birth certificates, or the im-

possibility of access, the question that remains to be decided is what evidence is competent and sufficient to rebut this presumption and to authorize a finding contrary thereto. *Wright v. Hicks*, 15 Ga. 160 (60 AD 687); *Mims v. State*, 43 Ga. App. 100 (1) (157 SE 901).

It is true that where the problem has been considered the courts of a majority of the states have followed Lord Mansfield's declaration in Goodright v. Moss, 2 Cowp. 591 (1777) (98 Eng. Reprints 1257), that it would be indecent and immoral to permit parents of children to "bastardize the issue born after marriage" by testifying themselves as to non-access of the husband, but there has been a trend among the states to repudiate the rule either by statute or by court decision. See a discussion of the matter and a citation of the cases in 7 Wigmore on Evidence (3rd Ed.), 358, 368, §§ 2063, 2064; 10 AmJur2d 869, Bastards, § 33; Anno. 60 ALR 381; 68 ALR 421; 89 ALR 912; 4 ALR2d 567. Wigmore asserts (p. 369) that "these high-sounding 'decencies' and 'moralities' are mere pharisaical afterthoughts, invented to explain a rule otherwise incomprehensible, and lacking support in the established facts and policies of our law. There was never any true precedent for the rule; and there is just as ·little reason of policy to maintain it." Echoing Wigmore, the Supreme Court of Mississippi in Moore v. Smith, 178 Miss. 383, 393 (172 S 317) asserted that the rule "would protect an unfaithful wife, and also her paramour, both of whom had grossly violated the matrimonial relation; would close the mouth of the injured husband, and force him to remain tied to an unfaithful wife, and to acknowledge and support a child which is not, in fact, his. To adopt a rule causing such a result, under the guise of protecting the matrimonial relation, would press the relation to the breaking point, and the maxim, 'nothing too much,' applies everywhere and always. That protection of the matrimonial relation is not the basis on which the exclusion of the evidence here in question is demonstrated when we remember that husband and wife are competent witnesses to the fact of their non-access when the legitimacy of a child is not in issue. . ." Cf. *Pinnebad v. Pinnebad*, 134 Ga. 496 (68 SE 73); *Hinkle v.*

*Hinkle,* 209 Ga. 554, 556 (74 SE2d 657). Access is generally a matter within the confines of the bedroom. Third-party evidence is hardly as dependable as that of those who may have been present. No person is in better position to know the truth as to parentage than the mother.

Lord Mansfield's rule is not binding on the courts of this state since it did not come until 1777; we adopted only the common law and statutes of England which were of force May 14, 1776. *Grimmett v. Barnwell,* 184 Ga. 461, 464 (192 SE 191, 116 ALR 257). All parties to any action or proceeding were made competent to testify as to any relevant matter or question by the Act of 1866 (Ga. L. 1866, p. 138), now found in *Code* § 38-1603, with stated exceptions. The same Act made provision, however, that it would not apply to any suit, action or proceeding *in any court, instituted in consequence of adultery,* or for the breach of promise of marriage, and that provision became *Code* § 38-1606. In 1935 (Ga. L. 1935, p. 120) it was amended to eliminate the provision relating to actions for breach of promise, and in 1951 (Ga. L. 1951, p. 596) a proviso was added making one charged with adultery competent to testify as to his or her innocence.[1] This Code section is not

---

[1] Obviously to avoid the ruling in *Weeks v. Weeks,* 160 Ga. 369 (3) (127 SE 772). It did not have the effect of rendering a party competent to testify concerning the adultery of an opposite party (*Peacon v. Peacon,* 197 Ga. 748 (30 SE2d 640)), and, indeed, it may require a repeal of *Code Ann.* § 38-1606 to make a party competent to testify concerning the adultery (other than denying his own guilt) of either party in a court action instituted in consequence thereof, particularly cases involving issues of filiation. Section 38-1606, being an express exception to § 38-1603, is to be given a narrow construction and will not be broadened beyond its specific terms. "Where there is an express exception it is the only limitation on the operation of the statute, and no other exceptions will be implied." 2 Sutherland, Statutory Construction (1966 Supp.) § 4936. Accord: *Washington v. Atlantic C. L. R. Co.,* 136 Ga. 638, 644 (71 SE 1066); *Barnett v. D. O. Martin Co.,* 191 Ga. 11, 14 (11 SE2d 210, 131 ALR 725); *Williams v. Seaboard Air-Line R. Co.,* 33 Ga. App. 164, 165 (125 SE 769); *Dalton Brick &c. Co. v. Huiet,* 102 Ga. App. 221, 223 (2) (115 SE2d 748).

applicable here because, (a) the proceeding is not brought in any court—it is before an administrative body, and (b) it was not instituted *in consequence of adultery*—it was instituted in consequence of an employee's death from accidental injury. *Arnold v. Arnold*, 141 Ga. 158 (161 SE 652).

The policy of Georgia law is to admit evidence, even if its admissibility is doubtful, because it is more dangerous to suppress the truth than to allow a loophole for falsehood. *Lovejoy v. Tidwell*, 212 Ga. 750, 751 (95 SE2d 784); *Carroll v. Hayes*, 98 Ga. App. 450, 452 (105 SE2d 755); *Clemones v. Alabama Power Co.*, 107 Ga. App. 489, 494 (130 SE2d 600). "The object of all legal investigation is the discovery of truth." *Code* § 38-101.

Under the rule enunciated in *Wright v. Hicks*, 12 Ga. 155 and 15 Ga. 160, supra, and the provisions of *Code Ann.* § 38-1603, the widow, Dorothy Gibbons, was competent to testify concerning her conduct, habits of life, etc., including her cohabitations with other men who, in her opinion, became fathers of her children. Her statements to the vital statistics bureau as reflected in the birth certificates, concerning the parentage of the children, were also admissible. This raised a question of fact as to whether some of the children were legitimate, which the board was authorized to resolve, and did resolve. The findings in that respect are supported by evidence and will not be disturbed.

*The judgment of the superior court is reversed insofar as it sets aside the award of compensation to the widow, Dorothy Gibbons, but is otherwise affirmed. Bell, P. J., Hall, Deen and Quillian, JJ., concur. Felton, C. J., and Eberhardt, J., dissent as to Division 2. Frankum, P. J., Jordan and Pannell, JJ., dissent as to Division 3.*

EBERHARDT, Judge, dissenting as to Division 2. The evidence in this record demands a finding that Dorothy Gibbons voluntarily abandoned her husband and that the abandonment continued at the time of the accident from which he died.

She testified that "In September of 1950 I moved to McKeesport, Pennsylvania," and that "The day before I left [Thomas Gibbons, my husband] asked me not to go and I left anyway. . . . I left with my aunt and I had to go to his house to get

Nathaniel. . . He wanted me to stay but I went on." True enough, she also testified that he visited her twice in McKeesport between the time she went there in 1950 and the time of his death in 1962, and of his having sexual relations with her when he stayed for a week on one occasion. He sought her return to Savannah, promising to provide a home for her,[1] even as Hosea importuned his unfaithful Gomer, though she asserts he did not provide the home, neither did she return, agree to return, or even offer to return to Savannah and in fact did not return to Savannah save on a trip in connection with a court proceeding to compel the husband to provide support for the two children whom she acknowledged to be his. Thus, even if the abandonment ended when the husband visited and slept with her in Pennsylvania, she abandoned him again when she ignored his invitation to return to live with him, and this continued until after his accidental death. "Any refusal on her part to go back to him would have been an abandonment [by her]." *Sims v. American Mut. Liab. Ins. Co.*, 59 Ga. App. 170, 171 (200 SE 164). And there can be no gainsaying that under the circumstances here the abandonment was wilful. It was her own act, in the face of the husband's importunities that she do otherwise. Her assertion that he did not fulfill the promises to

---

[1]She testified that the deceased had twice visited her in Pennsylvania, once staying a week, and that he had sexual relations with her on each occasion. In connection with these visits she testified: "Q. Did he ever make any promises to you then about providing a home for you? A. Yes, he did. Q. Did he ever fulfill those promises? A. No, he didn't." It is to be borne in mind that she was a party to the proceeding and that her testimony must be construed against her. *Steele v. Central of Ga. R. Co.*, 123 Ga. 237 (1) (51 SE 438). She is not entitled to prevail if that version of her testimony the most unfavorable to her shows that the verdict or finding should be against her. *Davis v. Akridge*, 199 Ga. 867 (2) (36 SE2d 102). Giving this portion of her testimony the construction thus required, it is at once apparent that the deceased was seeking her return to Savannah; there is no other logical reason for his making the promises. And we must construe it as having occurred at the end of his last visit.

provide a home for her, though with his parents or with her parents, until she first abandoned him to live with Abraham Brown, a man whom she asserted to be the father of one of the children and for whom she named the child, does not justify her abandonment. Her only complaint about the home provided was that there had been "in-law trouble." The husband, as head of the house, has both the duty and the right to provide the home where his family shall live. He may not always be able to provide the kind of home most satisfying to the wife. But there is nothing in the evidence to indicate that what he did provide was inadequate—merely that it may not have been as pleasant as she would have liked because of "in-law trouble." No attacks appear to have been made against her, either physically or morally. There was no complaint of lack of food or raiment. Moreover, the law does not require of any person the doing of a vain or useless thing. *Irvin v. Locke*, 200 Ga. 675, 679 (38 SE2d 289); *Johnson v. State*, 215 Ga. 839 (5) (114 SE2d 35); *McDaniel v. Employers Mut. Liab. Ins. Co.*, 104 Ga. App. 340, 341 (121 SE2d 801). It would certainly have been vain and useless for the husband to purchase or rent a home in Savannah in the hope of her return when she had already declined to do so.

She freely testified about her adulterous conduct with a number of other men beginning before her departure from Savannah and continuing after moving to McKeesport. I can conceive of no more flagrant an abandonment on her part. See *American Mut. Liab. Ins. Co. v. Armstrong*, 65 Ga. App. 497 (15 SE2d 822).

We reach an immoral result. I cannot believe that it was ever intended by the General Assembly that compensation should be provided to the hedonistic cuckoldry of an abandoning, adulterous wife who engaged in a pejorative promiscuity, publicly practiced, or to its fruits. Sodom and Gomorrah! But even if our public policy wraps a protective shield about the fruits, it goes no further. I must dissent insofar as the result is to award any compensation to this undeserving dam who, having abandoned her husband, boasts of producing five children sired by five strangers to the conjugal bed—naming them! I sincerely

hope that the honorable area of workmen's compensation shall not become infected with the national scandal attending our public assistance rolls.

I am authorized to state that Chief Judge Felton concurs in this dissent.

FRANKUM, Presiding Judge, dissenting as to Division 3. No Georgia case expressly passing upon the admissibility or probative value of testimony by a husband or wife as to non-access in a case where the issue is legitimacy or illegitimacy of a child born in wedlock has been called to the court's attention, and none has been found by me. However, it appears to be the almost universal rule, though admittedly not without its exceptions, in other jurisdictions where this issue has been passed upon, that, where the legitimacy or the illegitimacy of a child born in wedlock is in issue, neither the husband nor the wife may testify as to non-access between them. See 10 AmJur2d 869, Bastards, § 33, nn. 11 & 12, and see Annotations, 60 ALR 381, 68 ALR 421, 89 ALR 912, 4 ALR2d 567, and Ray v. Ray, 219 N.C. 217 (13 SE2d 224). As has been said, this rule rests on the broad ground of general public policy to protect the children born during the marriage as well as the parties, and it applies even though the husband is dead when the wife's testimony as to non-access is offered. See Ray v. Ray, supra; Farley v. Farley, 138 W. Va. 598 (68 SE2d 353); Barr's Next of Kin v. Cherokee, Inc., 220 S. C. 447 (68 SE2d 440). Under modern authorities the prohibition against the mother and her husband testifying is limited merely to testimony as to non-access. So, it has been held in some jurisdictions that the spouse may testify to independent facts and circumstances from which non-access and impossibility of parenthood may be inferred, and thus under this rule the wife may testify as to her illicit relations with another man. 10 AmJur 2d 870, Bastards, § 35. Obviously, such testimony alone is not sufficient to rebut the presumption of legitimacy of any child where the possibility of access by the husband is not negatived. I think that the better rule is, however, that proof of non-access, if it is to be permitted at all, must come from independent sources and from the testimony of other persons who may show facts from which the impossibility of access may be inferred.

Though the point was not directly involved, the Supreme Court, on the second appearance of the *Wright* case (15 Ga. 160, at page 172), recognized the principle that the declarations of the wife and her husband would not be admissible in evidence to bastardize the issue. The court went on to say, however, that the wife and her husband being dead, such declarations were competent evidence so as to make an issue when considered with evidence of their other conduct as explanatory of their declarations. This court in the comparatively recent case of *Colson v. Huber*, 74 Ga. App. 339 (39 SE2d 539), clearly enunciated and applied the principle that a mother's evidence could not be received to bastardize children born to her during lawful wedlock. That case is not direct authority, however, for the proposition now before us, because there the question was whether a void contract pleaded as the basis of the plaintiff's action would support it. This court rested its ruling there squarely on the proposition that good morals and public policy forbid that a woman be permitted to assert the illegitimacy of her children born in lawful wedlock, so as to furnish consideration for a contract, and that the legitimacy of her children is so conclusively presumed that she cannot rebut it and thereby secure to herself or to her children a cause of action based on a contrary assumption.

In Barr's Next of Kin v. Cherokee, Inc., 220 S.C. 447, supra, the contest was between two classes of claimants under the South Carolina Workmen's Compensation Act. That case more closely resembles on its facts the case before us than any I have found. In holding that the evidence of the mother of the minor claimant there involved could not be received to prove her to be the illegitimate daughter of the deceased employee where it appeared that at the time the child was conceived and born the mother was the wife of another man, the Supreme Court of South Carolina, in an exhaustive and well reasoned opinion, clearly stated what I deem to be the law. I take the liberty of quoting at length from that opinion, at pages 462, 463, and 464:

"It seems now to be well established in most jurisdictions, that unless otherwise provided by statute, neither husband nor wife

may testify as to non-access between them in any case where the question of the legitimacy of a child born in wedlock is in issue. The evidence of non-access must come from third persons. 7 AmJur 640, § 21; Anno., 69 ASR 571; 126 ASR 261. In Jones on Evidence, Second Edition, Sec. 97 (96), page 102, the rule is stated as follows: 'It is well settled on grounds of public policy, affecting the children born during the marriage, as well as the parties themselves, that the presumption of legitimacy as to children born in lawful wedlock cannot be rebutted by the testimony of the husband or the wife to the effect that sexual intercourse has or has not taken place between them; nor are the declarations of such husband and wife competent as bearing on the question. The rule not only excludes direct testimony concerning such intercourse, but all testimony of such husband or wife which has a tendency to prove or disprove legitimacy; for example, it was held incompetent to ask the husband, for the purpose of proving non-access, whether at a given time he did not live a hundred miles away from his wife and whether at that time he was not cohabiting with another person. Testimony of either party tending to show non-intercourse, or of any fact from which non-access may be inferred, or of any collateral facts connected with the main fact, should be scrupulously excluded, and if the illegitimacy is to be proved, it must be proved by other testimony. "The rule rests not only on the ground that it tends to prevent family dissension, but on broad grounds of public policy; hence it applies when at the time of the examination of the husband or wife the other spouse is dead. Nor is the rule affected by the provisions of the codes enlarging the competency of the witnesses; nor does it depend upon the form of action or the parties; on the contrary it obtains whatever the form of legal proceedings, or whoever may be the parties. . . While the rule prevents the wife from testifying that she has not had intercourse with her husband, it does not prevent the wife from testifying that another person than her husband has had or has not had connection with her.' The rule and the reasons therefor are well stated in Mink v. State, 60 Wis. 583 (19 NW 445, 446, 50 AR 386), where the court said: 'This rule is founded on the very highest grounds of public policy, decency,

and morality. The presumption of the law is in such a case that the husband had access to the wife, and this presumption must be overcome by the clearest evidence that it was impossible for him, by reason of impotency or imbecility, or entire absence from the place where the wife was during such time, to have had access to the wife, or to be the father of the child.' . . . The presumption of legitimacy, although rebuttable, is one of the strongest known to the law. 10 CJS 18, Bastards, § 3b. No child born in lawful wedlock can be decreed a bastard on any showing of circumstances which only create doubt and suspicion. Tarleton v. Thompson, 125 S.C. 182 (118 SE 421); State v. Shumpert, 1 S. C. 85; Kennington v. Catoe, 68 S. C. 470 (47 SE 719). As was stated by this court in Wilson v. Babb, 18 S. C. 59: 'The true test is whether the husband of the woman who gives birth to the child is its father; and this must, of necessity, in every case, be a question of fact. Where the child is born after lawful wedlock, and after the lapse of the usual period of gestation, it should require a very strong state of circumstances to overthrow the presumption of legitimacy, such as impossibility of access, absolute non-access, abandonment, or something equally as conclusive.' And it was held in the foregoing case that the burden in such cases is cast upon the party impeaching legitimacy, and such issue may be proved by any competent testimony sufficient to satisfy the mind of the tribunal before whom the question is raised."

I recognize, as does the majority opinion, that the question presented here is one of first impression in Georgia, and that to that extent this court is free to adopt whatever rule it deems best comports with the spirit of our law. I think that the majority have glossed over and virtually ignored the chief consideration which should control this decision. That consideration is the welfare and interest of the silent, non-testifying, parties to this controversy, the innocent children whose rights are here being adjudicated. It was not out of consideration for the marriage relation (as intimated by the majority opinion) so much as out of consideration to protect the rights of innocent children that the rule creating a strong almost conclusive presumption of legitimacy was first formulated by common law

courts. It is out of a consideration of this policy of our law that I would adopt the reasoning and the results reached by the Supreme Court of our sister state of South Carolina on this question. I, therefore, would hold that since the only evidence adduced before the deputy director as to access between Dorothy Gibbons and Thomas Gibbons during the time when the minor children here involved were conceived was the testimony of their mother, that such evidence was incompetent and without probative value and insufficient to sustain the finding of the deputy director that Thomas Gibbons was not the father of the children. I would hold that Dorothy Gibbons could not testify as to the non-access of Thomas Gibbons, and since there was no other evidence offered relating to the lack of access, the presumption as to the legitimacy of the children was not overcome. Such a holding, to my mind, would be more in harmony with the previous pronouncements of the Georgia courts which I have cited than the rule adopted by the majority.

However, even if it be conceded that the rule enunciated by the majority is a sound one and one which this court should adopt, I do not think that the evidence which was adduced was sufficient to overcome the presumption of legitimacy as to any particular one of the children born in McKeesport, Pa. This is so, because, as pointed out in the majority opinion, during the period of time that Dorothy Gibbons lived in McKeesport she bore three of the children who are now claimants. Thomas Gibbons visited her on at least two occasions and had sexual relations with her on the occasion of each of those visits. The dates of those visits and their relation to the time of conception or birth of the three children born in McKeesport are not shown by the evidence. Therefore, the evidence is insufficient to authorize any court to say, as to any particular one of the children, that it was impossible that it could have been conceived by Thomas Gibbons. Perhaps this is a matter which could be cleared up by remanding the case to the board for the taking of additional testimony, but, as the record now stands, the evidence is wholly insufficient to authorize a finding that the presumption of legitimacy has been effectually rebutted as to any particular one of those children.

I am authorized to state that Jordan and Pannell, JJ., concur in this dissent.