Floyd D. Gray

*v.*

Evelyn Marino, *et al.*

(No. 10529)

Submitted April 22, 1953. Decided July 7, 1953.

*Charles C. Wise, Jr.* and *E. Glenn Robinson*, and *James H. Wolverton*, for appellants.

*Claude H. Vencill*, and *Mahan, White* and *Higgins*, for appellee.

BROWNING, JUDGE:

Floyd D. Gray instituted this suit in chancery in the Circuit Court of Nicholas County praying for specific performance of a verbal agreement to make a will. The bill alleges that in the month of October, 1947, Mrs. Myrtle Ritchie, a widow, promised plaintiff, Gray, that if he would move into her home and remain with her each night thereafter, for as long as she lived and remained in business, she would give him, by will, all of her property at her death. The bill then alleges his acceptance and full compliance with the obligations imposed upon him thereby; and sets forth that, upon her death, two wills were produced and probated, one dated May 13, 1948 in which he was named sole devisee and beneficiary, and another, dated February 2, 1951, by which the property was given to the defendants.

The defendants demurred to the bill on the ground that the suit was barred by the Statute of Frauds and that the plaintiff had an adequate remedy at law, which demurrrer was overruled by the court. The defendants then jointly answered denying the material allegations of the plaintiff's bill.

The cause proceeded to trial and at the conclusion of the evidence, the court entered its order granting the

relief prayed for in the bill, from which order this Court granted an appeal on September 17, 1952.

The parties will be referred to in this opinion as plaintiff and defendants, the positions they occupied in the trial court.

The defendants seek a reversal of the decree of the circuit court upon the grounds that: (1) The plaintiff failed to prove the contract alleged by clear and convincing evidence; (2) the agreement is too indefinite to be enforceable; (3) the plaintiff failed to prove valuable consideration; (4) the contract sued upon is not equitable; and (5) the alleged verbal agreement upon which the suit is founded is unenforceable under the Statute of Frauds, Code, 36-1-3. The plaintiff maintains that the verbal contract was clearly proved, and that the contract was not within the provisions of our Statute of Frauds inasmuch as: (a) the first will of Mrs. Ritchie was a sufficient note or memorandum in writing to meet the requirements of the statute; (b) there was performance by the plaintiff under the terms of the contract; and (c) the contract required services on the part of the plaintiff of a personal nature and peculiar character not measured by any pecuniary standard.

This Court will not reverse a decree of a trial court unless it is plainly wrong, without evidence to support it, or clearly against the preponderance of all of the evidence. 1 M.J., Appeal and Error, § 277; *Hurley* v. *Hurley*, 127 W. Va. 744, 34 S. E. 2d. 465; and numerous other West Virginia cases cited in the text above mentioned.

"A contract to make a will is controlled by the same rules and principles and enforceable as other contracts." *Turner* v. *Theiss*, 129 W. Va. 23, 38 S. E. 2d. 369. *Jefferson* v. *Simpson*, 83 W. Va. 274, 98 S. E. 212. There is no doubt, notwithstanding the ambulatory nature of a will, that a person may by a certain and definite contract bind himself to dispose of his estate by will in a particular way, and that such a contract in a proper case will be

specifically enforced in equity. While, strictly speaking, an agreement to dispose of property by will cannot be enforced after the death of the promisor, courts of equity can do what is equivalent thereto by impressing a trust in favor of the promisee on the property in the hands of the heirs at law, personal representative or others who may claim title or be in possession thereof, which is the relief sought in this case, assuming that the plaintiff does not have an adequate remedy at law. However, a court of equity will grant relief by the specific performance of a contract to bequeath or devise property only where good conscience and natural justice are in accord with the enforcement of the agreement; and such a court scrutinizes closely the circumstances of an agreement to make a will and requires full and satisfactory proof of the fairness and justness of the transaction before lending its aid to the enforcement thereof. 57 Am. Jur., Wills, § 201.

"It is a well-established principle of equity that, in order to entitle one to specific performance, all the material provisions of the contract must be distinctly and clearly proven. Equity will not enforce a doubtful contract, for fear of doing a greater wrong by doing so than by leaving the parties to their legal remedy. Accordingly, * * * if it be parol, the proof must be so clear, cogent and convincing as to leave no doubt in the mind of the chancellor that the particular contract as averred was made, and its terms and conditions must be clearly shown. * * * " 17 M. J., Specific Performance, § 101; *Kennedy* v. *Burns*, 84 W. Va. 701, 101 S. E. 156; *Cooper* v. *Cooper*, 65 W. Va. 712, 64 S. E. 927.

In *Davidson* v. *Davidson*, 72 W. Va. 747, 79 S. E. 998, this Court said: "We are bound by the rule that such contracts [parol agreements to devise and bequeath property] are viewed by courts with suspicion, are not favored, and to be enforceable must be upon sufficient consideration, and be equitable, and clear and definite in terms." Furthermore, even where the terms of a con-

tract to devise or bequeath property are clear, certain and unambiguous, specific performance is not a matter of right, but rests in the sound discretion of the court, to be determined from all the facts and circumstances. 57 Am. Jur., Wills, § 201.

The plaintiff in this litigation is confronted with two statutes, both of which are actually rules of evidence. The first, Code, 36-1-3, reads as follows: "No contract for the sale of land, or the lease thereof for more than one year, shall be enforceable unless the contract or some note or memorandum thereof be in writing and signed by the party to be charged thereby, or by his agent. But the consideration need not be set forth or expressed in writing, and it may be proved by other evidence." The second statute, often referred to as the deceased person's statute, Code, 57-3-1, reads in part as follows: "No person offered as a witness in any civil action, suit or proceeding, shall be excluded by reason of his interest in the event of the action, suit or proceeding, or because he is a party thereto, except as follows: No party to any action, suit or proceeding, nor any person interested in the event thereof, nor any person from, through or under whom any such party or interested person derives any interest or title by assignment or otherwise, shall be examined as a witness in regard to any personal transaction or communication between such witness and a person at the time of such examination, deceased, insane or lunatic, * * *." The defendants were likewise handicapped in presenting their evidence by the last quoted statute.

We must apply the facts in this cause to these well established legal and equitable principles to determine the rights of the parties, and this requires a rather detailed recitation of the evidence adduced at the trial.

Mrs. Ritchie, deceased, had, for a period of approximately eight years prior to 1947, resided in the Town of Gilboa, in Nicholas County, where she operated a place

of business know as "Uncle Tom's Cabin", and in the same building maintained her living quarters. Her husband died in 1945, and thereafter she continued to operate the business with the assistance of one of the defendants, Violet Legg, and others, until the autumn of 1947 when the plaintiff Gray came to live at the Cabin. At that time, he was thirty-four and she was fifty-eight years of age. The circumstances under which he came, with the exception of the testimony of Keith Nutter, are not clear, probably because of the limitation placed upon the parties by the deceased person's statute. The record does reveal that Gray had, prior to that time, been living approximately two and one-half miles south of Gilboa in the Town of Zela with his wife. A very short time before moving to Mrs. Ritchie's residence, Gray and his wife were divorced, and he, according to his father's testimony, gave his property to his divorced wife. Keith Nutter is the only witness who testified to the alleged agreement between Gray and Mrs. Ritchie. He states that he, Gray and Mrs. Ritchie were in the living room of her house in the fall of 1947—the month of October he believes—and that he overheard a conversation between Gray and Mrs. Ritchie to this effect: "Well, she asked him to come there and stay with her at night; she was afraid to be there by herself; and if he would she would give him what she had at her death; and he said he would." The witness states that he never heard Mrs. Ritchie make a statement about the matter thereafter. The witness further states that at the time of this alleged conversation Mrs. Ritchie said that she was afraid to stay there at night, but he states later in his direct examination that although he was a regular visitor to the Cabin, having been there three or four times a week before and after the conversation, he knew of no unlawful or riotous conduct at that place. Upon cross-examination, Keith Nutter admitted that he owed Mrs. Ritchie $500.00 at the time of her death, and upon receiving notice that he was going to be sold out by the personal representative of the deceased, he paid the amount owing.

This witness also testified that Gray stayed at the Cabin regularly after the date of the alleged agreement, and until the last time that Mrs. Ritchie was taken to the hospital where she later died. He also testified that Violet Legg, one of the defendants, had been with Mrs. Ritchie at the Cabin "some few years" before the fall of 1947 when Floyd Gray started staying there.

Bona Nutter, a brother of Keith, stated that Mrs. Ritchie told him, shortly after Gray came to live at Uncle Tom's Cabin, that she had promised Gray that if he would move into her home and remain with her each night thereafter that she would will him her property. The witness further stated that Mrs. Ritchie repeated this conversation to him on two or three occasions after Gray came to live with her.

Mrs. Clarence Meeks, an aunt of the plaintiff Gray, a resident of Cannelton, West Virginia, testified that she, her husband, Mrs. Ritchie and Floyd Gray went to John's Hopkins Hospital in Baltimore, Maryland for the purpose of having her busband and Mrs. Ritchie go through the clinic at that institution, and that while there in Mrs. Ritchie's room, while she, Mrs. Ritchie and Gray were present, she heard Mrs. Ritchie make the following statement:

> "The second day we were there. She said, 'Floyd', she said, I 'believe they found something wrong with my heart.' She said, 'They are checking me awfully close,' and she said, 'In case something would happen to me that I would drop off or anything', she said, 'you go home and put that will that I made—or get those papers,' she said, 'and put them on record, and then send Bell and Simonds after my body because' she said, 'you can't never tell what my people might try to do,' and she turned to me and she said, 'You don't know what, of course, I am talking about but,' she said, 'I have obligated myself to give Floyd everything that I have by my will if he would come and stay with me, because I had to run this business here on

the road,' she said, 'and I am afraid.' She said, 'My health is bad and I am afraid to stay there by myself, because I handle a good bit of money and,' she said she told him if he would just come and stay with her and be there at night, why, she would, by her will, will him everything she had, because she said, 'My people don't need it; they have plenty,' and she said she didn't want to stay there by herself."

The witness stated that the four people named departed for Baltimore on November 15, 1948, arrived there on the 16th, and that the conversation which she related occurred on the second day after their arrival. She further stated that Mrs. Ritchie visited in her home a half dozen times or more, that she had visited Mrs. Ritchie a number of times and had observed that Floyd Gray was regularly staying at Mrs. Ritchie's house. However, when asked, upon direct examination, she stated that she did not remember the date of Mrs. Ritchie's death, nor the month, but she believed the year to be 1951. Mrs. Ritchie's physician testified that she had been suffering from a heart condition since the year 1911.

The trial chancellor was correct in permitting the testimony of Keith Nutter, he not coming within the prohibition of the deceased person's statute, by virtue of being indebted to Mrs. Ritchie at the time of her death. The testimony of Bona Nutter and Mrs. Meeks was also admissible as being declarations against interest made by Mrs. Ritchie subsequent to the date of the alleged oral contract. *Jefferson* v. *Simpson, supra; Bartlett* v. *Patton,* 33 W. Va. 71, 10 S. E. 21.

"The courts are not inclined to regard statements by the promisor against interest as of great weight, since it is recognized that such evidence consists in the repetition of oral statements which may be the result of a misunderstanding of the exact language used by the promisor, and generally regard such a statement as insufficient in itself to secure the establishment and specific performance of such a contract. * * * " 57 Am. Jur., Wills, § 186; *Peters* v. *Poro,* 96 Vt. 95, 117 A. 244, 25 A.L.R. 615.

There were several other witnesses who testified that Gray lived at the Cabin from the fall of 1947 until after Mrs. Ritchie was taken to the hospital in May, 1951. One of those witnesses, Maxine Brown, testifying for the plaintiff, stated that she and her husband lived, from May, 1950 until the time of the trial, directly across the highway from the Cabin. She stated that she was a part time employee of Mrs. Ritchie in her establishment, working from 8 p. m. until midnight. When asked whether Mr. Gray was there at night she stated: "Well, he wasn't there all the time." When asked this question: "Well, was he there some of the time?", she replied: "Yes, sir, I have seen him there occasionally." This witness further testified that, shortly after Mrs. Ritchie was taken to the hospital the last time, Floyd Gray left the establishment, but she remained even after Mrs. Ritchie's death. She stated that: "I stayed there with the girl. That was her request.", apparently referring to the request of Mrs. Ritchie.

Mrs. Ritchie was taken to the hospital the last time on May 8, 1951, and died June 28, 1951. The plaintiff Gray testified that he left Uncle Tom's Cabin after Mrs. Ritchie went to the hospital the last time; that he was married to his third wife on May 12, 1951, and thereafter lived in Summersville, West Virginia.

Betty Miller, savings teller at the Montgomery National Bank, testified that on March 29, 1949, a savings account was opened at that bank in the sum of $5,000.00 in the name of Floyd Gray, and that a short time thereafter it was changed to a joint account in the names of Floyd Gray and Myrtle Ritchie. She further stated that on September 18, 1950, Gray withdrew the account and opened it in the name of Mrs. Myrtle Ritchie, but that two days later Mrs. Ritchie and Floyd Gray came to the bank and reopened it as a joint account. On March 9, 1951, this witness says Mrs. Ritchie came to the bank, had the account changed to her name only, and that it remained in that status thereafter.

Bernard McCutcheon, cashier of the Nicholas County Bank of Summersville, stated that Mrs. Ritchie authorized Floyd Gray's signature on her checking account at that bank in 1948, and at that time the balance in the account was $5,650.79.

John William Groves, testified on behalf of the defendants, and said that he was a close friend of Mrs. Ritchie, aiding her on occasions with her business and personal affairs. He stated that he had spent "quite a few" nights and week ends at Uncle Tom's Cabin, after Gray came to live there, when the latter was absent. He stated that on some of those occasions Gray would be coon hunting, but where he was on other nights when absent he did not know. He further stated that Cecil Seebert lived directly across the highway from the Cabin, and that, while Gray was staying at Mrs. Ritchie's place, Seebert did all the general work that was to be done. He was asked this question, and made the following answer:

"Q. Do you recall any occasion when Myrtle Ritchie called upon Mr. Floyd Gray to perform such services for her which he refused to do?"

"A. Well, one specific thing I can mention is the stove down in the living room which went for quite a while and the weather was really cold and couldn't get a stove up. Cecil had to get it out of the old barn or garage, get the stove pipe from down at Mr. Gray's store, and put up the stove. That was one thing that I definitely recall."

He further stated that he was at the Cabin on one occasion when Mrs. Ritchie had pneumonia and that, although Gray was there, Mrs. Marino was required to build a fire. Mrs. Marino is apparently Evelyn Marino, one of the defendants in this cause.

Cecil Seebert, a witness on behalf of the defendants, stated that he lived within calling distance of the Cabin across the highway; that he took his meals with Mrs. Ritchie, serving as a kind of handy man for her; "helped

her out in different ways; taken her to the doctor a few times, and drive her around a number of times, and carrying in coal and wood and beer and drinks like that." He was asked if he did these duties while Gray was there and he answered in the affirmative. This witness stated that he stayed in the Cabin with Mrs. Ritchie when Gray was "out either hunting or some place else, I don't know exactly, but lots of times he wasn't there at night and I wouldn't be at work, and I would stay there when I was off from work—fishing and—he was quite a bit of a fisherman." When asked: "You say he was away two or three hundred nights during that approximately three-year period?", Seebert answered: "Yes, sir, maybe more, because I didn't keep no track of the dates on it." He further stated, referring to Gray, that: "I have got my first time to see him carry a bucket of coal or anything like that, case of beer or soft drinks, or anything like that."

The defendants offered R. A. Clapperton, an attorney of Summersville, as a witness, who stated that Mrs. Ritchie came to his office in December, 1950, or early in January, 1951, but the trial court refused to permit him to testify as to a conversation had at the time between Mrs. Ritchie and the witness relative to a will. We are of the opinion that the court was correct in excluding this testimony, the declarations having been made in the absence of Floyd Gray, the other party to the alleged parol agreement, and such statements under those circumstances were self-serving. *Crothers* v. *Crothers*, 40 W. Va. 169, 20 S. E. 927; *Jefferson* v. *Simpson, supra.* However, the testimony of this witness to the effect that he saw a handwritten will in Mrs. Ritchie's possession, upon the occasion of her visit to his office, on which was written the name of "Evelyn Marino", among other things which he could not recall, was admissible. This witness had no interest in this cause that would exclude his testimony under the deceased person's statute, nor was there an attorney-client relationship between him

and Mrs. Ritchie. The trial court erroneously excluded this part of the witness's testimony.

The evidence adduced in this cause, perhaps partially because of the prohibition of the deceased person's statute, does not clarify the relationship which existed between Floyd Gray and Mrs. Ritchie between October, 1947 and May, 1951. " * * * Circumstantial evidence as to the relation of the parties, their business habits, and the surrounding circumstances is admissible on the issue whether a contract to devise property in consideration for services to be rendered was made. * * * " 57 Am. Jur., Wills, § 185. We know that in October, 1947, Floyd Gray, freshly divorced from his second wife, came to live with Mrs. Ritchie in the residence part of her place of business; that on May 13, 1948, Mrs. Ritchie executed a holographic will devising and bequeathing all of her property to Floyd Gray; that on February 2, 1951, Mrs. Ritchie executed another holographic will by which she gave her property to the defendants; that on May 8, 1951, she was taken from her home to a hospital in Charleston, where she died June 28, 1951 without returning to her place of residence at Gilboa; and that, on May 12, 1951, four days after she was removed to the hospital, Gray left Mrs. Ritchie's establishment, married a third wife, and established residence in the Town of Summersville. The other pertinent events and occurrences that transpired during this period of time have been related.

The plaintiff maintains that the will of May 13, 1948, is evidence of the alleged parol agreement between the parties, and cites in support of this contention *Wilson* v. *Starbuck*, 116 W. Va. 554, 182 S. E. 539; *In Re Reed's Estate*, 125 W. Va. 555, 26 S. E. 2d. 222. This Court has considered it as such, along with the other evidence, in arriving at its conclusion in this cause. However, the *Wilson* and *Reed* cases involved mutual testamentary, instruments and, of course, the decisions in all of the cases relied upon were based upon the factual situations as pre-

sented therein. Furthermore, in none of these cases, or any others that we have found, has a court of equity granted specific performance of a parol agreement to devise property where the deceased promisor had revoked a former will in favor of the alleged promisee and devised the property to others by a second will. However, if the first will was in conformance with the alleged oral agreement of the previous fall, there is no explanation for the delay in executing it, nor, of course, is there any reference therein to the alleged parol agreement. On the other hand, the execution of the second will, and the conduct of the plaintiff in remarrying four days after Mrs. Ritchie was taken to the hospital, at a time when he did not know whether she would recover and return to her place of business, are also circumstances to be considered in determining whether any agreement was entered into between the parties whereby the plaintiff, as alleged in his bill of complaint, "obligated himself to spend the nights thereafter, and so long as the said Myrtle Ritchie lived and remained in business at the location aforesaid, * * * to afford protection to the said Myrtle Ritchie and to her said place of business. * * *"

In *Miller* v. *Miller's Ex'r.*, 2 Va. Dec. 97, 21 S. E. 471, 473, the court said: "It is a serious matter, when a man dies, for a claimant to come forward, and demand the estate, upon the ground that deceased had in his lifetime verbally promised or agreed to make a will giving his estate to said claimant, and that, too, in the face of a will which has given it to some one else. Such a claim naturally excites surprise, and a court of equity will always require the clearest and most convincing proof to sustain such a claim." Realizing that the discretion of a court of equity to grant or withhold specific performance of a contract is not an arbitrary or capricious one, but is a judicial discretion to be exercised in accordance with settled rules and principles of equity, and with regard to facts and circumstances of the particular case, we hold that the plaintiff failed to prove the parol agreement alleged in his bill of complaint by clear and con-

vincing evidence, as is required in such case, and that the ruling of the trial chancellor to the contrary was plainly wrong.

In view of the plaintiff's failure to prove the contract as alleged, it is unnecessary to pass upon the question of whether or not the revoked will of May 13, 1948, would have been a sufficient memorandum to avoid the effect of the Statute of Frauds. However, as the question was ably and intelligently argued and briefed by counsel on both sides, and has been answered in the affirmative by the trial court in passing upon defendants' demurrer, it may be well to discuss it very briefly at this point.

We are of the opinion that the precise point has not been heretofore decided by this Court, but we believe the rule to be that a will, containing no reference whatsoever to the parol agreement sought to be established and subsequently revoked by the execution of another will, in and of itself does not constitute a sufficient memorandum to permit the by-passing of the Statute of Frauds. That such·may be some evidence to support a purported parol agreement is clear. *Wilson* v. *Starbuck, supra; In Re Reed's Estate, supra.* However, we are in accord with the holding in the case of *Hale* v. *Hale,* 90 Va. 728, 19 S. E. 739, wherein it was said: " * * * the appellant contends that the case is not within the statute, because the wills in question are sufficient memoranda of the agreement to satisfy the requisition of the statute. But can this view be maintained? We think not. An examination of the wills, which are exhibited with the bill, shows that each purports to be a mere will, and nothing else. Neither alludes to any contract, or refers to any other writing; and the established rule is that the memorandum of a contract for the sale of real estate required by the statute must show, either on its face or by reference to some other writing, the contract between the parties, so that it can be understood without having recourse to parol proof." This rule has been approved

and followed in numerous other jurisdictions. *White* v. *McKnight*, (S.C.), 143 S. E. 552, and cases cited therein. In so stating, we are not unmindful of the language of Judge Hatcher in *Tearney* v. *Marmiom*, 103 W. Va. 394, 137 S. E. 593. A determination of whether any conflict or inconsistency is presented thereby to the later rulings of this Court will be reserved, however, until the question is squarely presented.

The decree of the Circuit Court of Nicholas County is reversed and the bill is dismissed.

*Reversed; bill dismissed.*