## IN THE INTERMEDIATE COURT OF APPEALS OF WEST VIRGINIA

**FILED**

**August 29, 2025**

ASHLEY N. DEEM, CHIEF DEPUTY CLERK
INTERMEDIATE COURT OF APPEALS
OF WEST VIRGINIA

**FRANCIS MCGUIRE
AND EQUITY CAPITAL, LLC,**
**Defendants/Counterclaimants Below, Petitioners**

**v.) No. 24-ICA-407**          (Circ. Ct. of Cabell Cnty. Case No. CC-06-2020-C-409)

**KEITH MCGUIRE,**
**Plaintiff/Counterclaim Defendant Below, Respondent**

### MEMORANDUM DECISION

Petitioners Francis McGuire and Equity Capital, LLC, appeal the Circuit Court of Cabell County's September 11, 2024, final order entered after a bench trial in a business dispute. In the underlying litigation, Respondent Keith McGuire alleged that his attempts to exercise an option contract were frustrated by Francis McGuire, who rejected the option. The circuit court ruled in Keith McGuire's favor and denied Francis McGuire and Equity Capital's counterclaims. Keith McGuire filed a response.[1] Petitioners filed a reply brief.

This Court has jurisdiction over this appeal pursuant to West Virginia Code § 51-11-4 (2024). After considering the parties' arguments, the record on appeal, and the applicable law, this Court finds no substantial question of law and no prejudicial error. For these reasons, a memorandum decision affirming the circuit court's order is appropriate under Rule 21 of the Rules of Appellate Procedure.

This dispute involves a father, Francis McGuire, and son, Keith McGuire, who collaborated on several real estate development and investment projects. In 2013, the pair discussed establishing Capital Investments, LLC ("CI"), a real estate company that would acquire and develop properties. The first project they identified was a parcel of property at the entrance of the Huntington Mall in Barboursville, West Virginia ("Mall Property").

Keith McGuire retained attorney Curtis "Curt" Anderson to draft the necessary documents to set up and organize CI. Mr. Anderson testified that Keith McGuire was working on leases and obtaining funding for the Mall Property project, but that he "needed some assistance in obtaining the financing, so he looked to his dad to help." Francis

---

[1] Petitioners are represented by Robert H. Sweeney, Jr., Esq., and Benjamin G. Worthan, Esq., Jenkins Fenstermaker, PLLC. Respondent is represented by Evan S. Aldridge, Esq., Flaherty Sensabaugh Bonasso, PLLC.

1

McGuire signed the mortgage and promissory notes to finance the Mall Property project and served as the guarantor of the debt. Francis McGuire testified at trial that he believed CI to be a joint venture between him and Keith McGuire, but the CI operating agreement drafted by Mr. Anderson identifies Francis McGuire as the owner of 100% of CI's membership interests. Mr. Anderson testified that Francis McGuire was made the owner of CI "for financing purposes and financing purposes solely." He continued,

> I think Keith had concerns about producing financials and his father was in a stronger financial position to get better financing. So anyone who owns an interest in an LLC has to produce those financials, so the idea was to make Francis the sole owner and give Keith the option to basically pull that back or claw that back, so to speak, with the option.

Accordingly, Mr. Anderson drafted a document titled, "Option for Purchase of Membership Interests" (the "First Option"), which the McGuires executed on April 15, 2013. The First Option stated that Francis McGuire desired to grant Keith McGuire an option to purchase all membership interests in CI for the total purchase price of $550,000.[2] The McGuires also signed a Management Fee Agreement on April 15, 2013, which provided that CI "shall pay to [Keith McGuire] a fee equal to the Company's net cash flow, less any funds necessary for the payment of income taxes, or other expenses related thereto, of [Francis McGuire], if any, and unless this Agreement is otherwise terminated." Per the Management Fee Agreement, Keith McGuire was to receive all of CI's net cash flow after Francis McGuire's taxes and expenses were paid. Mr. Anderson testified that this was part of the arrangement between the McGuires, wherein Francis McGuire's role was solely as a guarantor. Mr. Anderson stated,

> [T]here were concerns about whether Francis would have any tax ramifications associated with this, and the idea was that Keith was to make the income. I mean, he was the one who brought this to the table. He was the one who did everything. He was the one who, you know, negotiated all the leases. He was the one who did it all. And the income was intended to go to Keith. So we – I drafted this fee arrangement in a way that essentially you take the gross profits and you subtract out all the debts and expenses and that fee agreement is what was left over. So the net effect to the LLC was to be zero.

> The Management Fee Agreement was to be effective for two years and was renewable for one-year terms upon agreement of the parties, in writing. The McGuires did

---

[2] Mr. Anderson testified that the price amount was an error, and that the dollar figure was intended to be $250,000. He took responsibility for printing the wrong draft of the document in haste prior to its signing by the parties.

not execute an express written agreement to extend the Management Fee Agreement after the first two-year term, but Keith McGuire testified that he "was under the understanding that we were continuing to operate under" it, and he continued to operate CI as its manager. The McGuires also executed a Development Services Agreement and an Operating Agreement for CI.

CI purchased the Mall Property and made all the mortgage payments. Francis McGuire testified that he did not recall ever making any out-of-pocket payments on behalf of CI. Attorney Anderson testified that the Mall Property was eventually sold after Keith McGuire found a buyer. CI made a profit of around $1,000,000 from the sale, and a distribution of $250,000 was made to Francis McGuire. The remaining profit from the sale, approximately $921,000, was attributable to Keith McGuire as his fee under the Management Fee Agreement. However, rather than making a distribution to Keith McGuire, the remaining profit from the sale of the Mall Property was used to acquire a mall property in Warner Robins, Georgia ("Georgia Mall"). Mr. Anderson testified that he was involved in discussions with the McGuires about using Keith McGuire's money as a down payment on the Georgia Mall.

As part of this business endeavor, a Georgia limited liability company, CI Warner Robbins ("CIWR"), was established as a subsidiary of CI. The Georgia Mall property is deeded in CIWR's name and is CIWR's sole asset. Nonrecourse financing of the Georgia Mall was obtained and Francis McGuire acted as guarantor, though he put no money down and made no personal payments on the note. Francis McGuire claimed he had a verbal agreement with Keith McGuire to split the profits upon the sale of the Georgia Mall, with Francis to receive thirty-five percent and Keith to receive sixty-five percent. However, at trial, when asked whether he would "assign sixty-five percent of the sales proceeds" to Keith McGuire if the Georgia Mall property were to be sold, Francis McGuire testified that he "[couldn't] make that commitment at [that] time."

Mr. Anderson drafted a second option contract titled, "Novation of Previous Option Agreement and Second Option for Purchase of Membership Interests" (the "Second Option"), which the parties executed on or about November 14, 2014. The Second Option states, in relevant part:

> WHEREAS, Optionor [Francis McGuire] is the owner of One Hundred Percent (100%) of the membership interests of [CI] . . . which is engaged in the business of operating a real estate investment company.

> WHEREAS, Optionor previously granted Optionee [Keith McGuire] and [sic] Option For Purchase of Membership Interests, the same being dated April 15, 2013.

WHEREAS, Optionor is withdrawing simultaneously with a refinancing, a capital contribution from the Company [CI] in the amount of Five Hundred and Fifty Thousand Dollars ($550,000.00).

WHEREAS, as a result of the withdrawal of the capital contribution by Optionor, and in consideration of allowing the withdrawal of the capital contribution by Optionee and of releasing Optionee from any and all guarantees, both parties seek the novation of the previous Option.

WHEREAS, Optionor also desires to grant to Optionee and Optionee also desires to acquire from Optionor, a new option to purchase all membership interests in the Company on the terms and conditions contained herein.

THEREFORE, in consideration of the mutual promises and conditions herein contained, the parties agree as follows:

. . . .

3. *Option Purchase Price/Term*. Optionor does hereby grant to Optionee, his successors and or assigns, the right and option to purchase, for cash at any time hereinafter, all or any portion of the Membership Interest, up to a maximum of One Hundred Percent (100%) of the outstanding Membership of the Company, for the total purchase price of Ten Dollars ($10.00), (the "Purchase Price"), or such prorated share if fewer than One Hundred Percent (100%) of the Membership is purchased. This Option may be exercised as to all or any part of the Membership interest at any time by serving written notice to the undersigned Optionor of Optionee's intention to exercise such Option, stating the percentage as to which such option will be exercised and the date on which payment therefore will be made.

. . . .

5. *Conditions of Closing*.
a. Optionor. Unless waived, in whole or in part, in writing by Optionor the obligations of Optionor hereunder are subject to the fulfillment at or prior to the Closing, as provided in Section 5 of this Agreement, of each of the following conditions:
i. Optionee shall tender the full Purchase Price[.]
ii. Optionee shall assent to and execute a valid and enforceable Operating Agreement, which Agreement shall restrict the transfer of all of the Membership interests.
iii. Optionee shall call Optionor to be fully released from any and all guarantees and/or liabilities.
iv. Optionee shall agree to indemnify Optionor for any and all assessments, penalties, and/or interest, asserted by any government taxing authority

against Optionor as a result of any act or omission of Optionee in managing the business of the Company.

. . . .

6. *Closing*. The Closing shall be held . . . on or before Thirty (30) Days from notice of Optionee's intent to exercise the Option (the "Closing Date"). In the event that either party shall not have fulfilled the Conditions of Closing imposed on him by Section 4 of this Agreement at or before that time, the Closing shall be postponed for a reasonable period of time not to exceed Sixty (60) Days.

7. *Representations and Warranties by Optionor*. Optionor represents and warrants to Optionee as follows:

a. Optionor has good, absolute, and marketable title to the Membership interest, free and clear of all liens, claims, encumbrances and restrictions of every kind and shall maintain this status during the period of the Option, except as may be required to secure lending through United National Bank. Optionor has the complete and unrestricted right, power and authority to enter into this Option and to later sell, transfer and assign the Membership interest pursuant to the Option.

b. The Company is a duly organized and validly existing West Virginia company in good standing, with all requisite corporate power to carry on its business as presently conducted. The company has no subsidiaries and has no direct or indirect equity interest in any other firm, corporation or business enterprise.

c. There is nothing in the Articles of Organization of the Company that would prohibit this Option.

d. There are no outstanding options, contracts, commitments, warranties, agreements or other rights of any character affecting or relating in any manner to the issuance of the Company's Membership interest.

e. The Company is not in material default under, or breach of, any of its contracts in excess of Twenty Five Thousand Dollars ($25,000.00), to the best of its knowledge.

f. The Company is not in default or violation of any provisions of its indebtedness nor is it delinquent in the payment of, nor has it failed to file a return for any federal, state or local taxes, assessments or governmental charges to the best of its knowledge.

. . . .

14. *Severability*. In the event that any term or provision of this Agreement is invalidated at any time by court decision, statutory provision, governmental

regulation, or otherwise, the remaining terms and provisions of this Agreement shall remain in full force and effect and be fully binding upon both parties.

Francis McGuire did not withdraw a $550,000 capital contribution from CI, but he testified at trial that he believed the basis for changing the first option was that he would be withdrawing a $550,000 capital contribution. Mr. Anderson's testimony contradicted this assertion, and he expressly stated that Francis McGuire never told him that he expected to receive $550,000. Attorney Anderson stated that the $550,000 figure was a drafting error that was mistakenly carried over from the First Option contract. He stated the correct figure was $250,000, and was intended to reflect the $250,000 that Francis McGuire was paid from the sale of the Mall Property. Mr. Anderson indicated the error was corrected in a subsequent third option contract that the parties never executed.

In 2018, Equity Capital, LLC, ("EC") was formed in order to own property that Francis McGuire intended to develop located in the 2200 block of Fifth Avenue in Huntington, West Virginia ("Fifth Avenue Property"). EC's sole member was CI. Keith McGuire had no ownership interest in EC. EC borrowed money from United Bank for the purchase and development of the Fifth Avenue Property. Francis McGuire testified that he began this development by himself and was in talks with other developers, but later worked on it with Keith McGuire. He testified at trial, "Keith said, Dad, why would you bring somebody else in? Why don't we do it on our own?" Francis McGuire testified that he and Keith McGuire "agreed to develop it on our own on a 50/50 basis. He would develop it, and, of course, I financed it. I owned the property at that point." Francis McGuire testified that he meant that he and Keith McGuire would evenly split any profits and losses associated with the Fifth Avenue Property. Keith McGuire testified that his "role was to get tenants." The parties did not execute a management services agreement or development agreement related to EC.

Keith McGuire testified that he negotiated a "lease agreement worth $1.8 million" for the Fifth Avenue Property, but that his father "turned that down," causing them to lose their "ability to do the development." The Fifth Avenue Property was not developed, and the property was ultimately sold at a loss in 2021. Francis McGuire testified that they entered into a lease agreement with Starbucks, but that Keith McGuire wanted a development fee that Francis McGuire did not want to pay. Keith McGuire agreed that he sought a developer's fee, which he said was "the same one we had at the Huntington Mall." After Francis McGuire refused to pay the fee, the deal with Starbucks broke down, and he was unable to secure tenants without Keith McGuire's help. Francis McGuire testified that the sale of the property did not cover the debt, and he paid about $125,000 out of his pocket to pay it off. Keith McGuire testified that he also made payments on the debt for EC.

Around February 13, 2020, Keith McGuire, by counsel, sent a "Notice of Exercise of Option" stating that he intended to "exercise his option by purchasing 100% of the

6

outstanding membership interests of [CI] and paying the Purchase Price . . . on or before April 27, 2020." The letter asked for a "full and complete list of any and all guarantees and/or liabilities that are expected to be released at Closing, as well as written confirmation regarding the validity and accuracy of the representations and warranties in Paragraph 7(a) through (f) of the Option Agreement." Keith McGuire sought the information in order to anticipate the amount of financing necessary to release the guarantees and liabilities relevant to the Second Option. However, Francis McGuire did not provide the requested list of guarantees and liabilities.

On December 4, 2020, Keith McGuire filed a complaint seeking a declaratory judgment in the Circuit Court of Cabell County, along with a motion for a temporary restraining order and injunctive relief. On January 6, 2021, EC filed an emergency motion to expunge notice of Lis Pendens, which was granted January 15, 2021.[3] On February 10, 2021, Keith McGuire filed an amended complaint, asking the circuit court to declare the Second Option to be a valid contract for the sale of Francis McGuire's membership interest in CI and identify the parties' rights and obligations under the option contract; and to find that Francis McGuire breached the Second Option contract and grant specific performance by requiring Francis McGuire to sell and transfer his interest in CI pursuant to the Second Option contract.

Francis McGuire and EC filed three counterclaims: the first and third asked the court to declare that CI and Keith McGuire formed a partnership, that CIWR and Keith McGuire formed a partnership, that EC and Keith McGuire formed a partnership, and that each partnership agreed to share profits and losses at certain percentages. The second counterclaim sought an accounting of all sums spent and received related to the Georgia Mall Property since 2015.

After several years of discovery and motions practice, the circuit court conducted a bench trial over three non-consecutive days — September 6, 2023, September 7, 2023, and August 19, 2024.[4] At trial, Francis McGuire testified that he believed that Keith McGuire

_____

[3] This motion related to the Fifth Avenue Property that EC sold at a loss during the pendency of the underlying litigation.

[4] At the conclusion of the second day of trial, the circuit court ordered the parties to continue efforts to cooperatively exercise the Second Option, with Keith McGuire securing necessary financing and remitting payment to Francis McGuire. The parties notified the circuit court that closing on the financing was expected to occur in mid-November, 2023, and closing on the purchase contemplated by the Second Option was expected to occur in December, 2023. However, on December 5, 2023, Keith McGuire filed an emergency motion for injunctive relief, and then on January 31, 2024, filed a motion to amend his complaint in order to seek damages he allegedly sustained when he tried to close the Second Option in late 2023. Ultimately, Keith McGuire withdrew both motions after the

7

could not perform according to the agreement "[b]ecause he couldn't obtain financing, couldn't release me from the obligations that I had signed for, couldn't find a partner to go bail us out, and didn't have any means or way or method to perform what was agreed to." Francis McGuire also conceded at trial that he was not aware of anything in the Second Option that requires Keith McGuire "to demonstrate his ability to release [Francis] from those loans as a prerequisite to exercising" the Second Option.

Keith McGuire testified that he would not have served as CI's Manager for a decade if he did not have the option to buy CI, and that he personally had to put money into CI over the years to keep it afloat.

On September 11, 2024, the trial court entered its Final Order, finding the Second Option to be a valid, enforceable contract and denying Francis McGuire and EC's counterclaims. The order found that specific performance was appropriate and ordered the parties to perform under the Second Option consistent with its terms and the declaratory judgments contained within the thirty-five-page order. It is from this order that Francis McGuire and EC now appeal.

On appeal, we apply the following standard of review:

> In reviewing challenges to the findings and conclusions of the circuit court made after a bench trial, a two-pronged deferential standard of review is applied. The final order and the ultimate disposition are reviewed under an abuse of discretion standard, and the circuit court's underlying factual findings are reviewed under a clearly erroneous standard. Questions of law are subject to a *de novo* review.

Syl. Pt. 1, *Public Citizen, Inc. v. First Nat'l Bank in Fairmont*, 198 W. Va. 329, 480 S.E.2d 538 (1996).

In their appeal, petitioners assert five interrelated assignments of error. First, petitioners argue that the circuit court erred by holding that the Second Option was valid and enforceable. Second, they claim that the court erred by ordering specific performance of the allegedly invalid and unenforceable Second Option agreement. Third, they argue that the court erred by ordering specific performance in a manner inconsistent with the Second Option agreement. Fourth, petitioners argue that the court erred in finding that no partnerships or joint ventures were created between Keith McGuire and CI, CIWR, and/or

---

settlement negotiations reached an impasse, and the 1031 exchange he had arranged in an attempt to close the Second Option was no longer available due to the passage of time. As settlement was no longer mutually feasible, the court ordered trial to resume on August 19, 2024.

EC. Finally, petitioners argue that the court erred by failing to order an accounting of CIWR. We will consolidate and restate these assignments of error for clarity and efficiency. *See Tudor's Biscuit World of Am. v. Critchley*, 229 W. Va. 396, 402, 729 S.E.2d 231, 237 (2012) (stating the general proposition that related assignments of error may be consolidated for ruling); *Jacquelyn F. v. Andrea R.*, No. 16-0585, 2017 WL 2608425, at *3 n.2 (W. Va. June 16, 2017) (memorandum decision) (restating assignments of error where they involve clearly related issues).

First, petitioners assert that the trial court erred by holding the Second Option valid and enforceable. Petitioners claim that the Second Option is facially invalid for violating the rule against perpetuities because it failed to specify a time limit and, therefore, could be exercised at any point in the future.[5] However, as petitioners concede, prior to this appeal, they did not raise the rule against perpetuities or any argument about the lack of time limitations on the exercise of the Second Option as a reason for its invalidation or unenforceability. As is well-established, appellate courts will not consider non-jurisdictional questions on appeal when they have not been decided at the trial court level. *Whitlow v. Bd. of Educ. of Kanawha Cnty.*, 190 W. Va. 223, 226, 438 S.E.2d 15, 18 (1993). "Our law is clear in holding that, as a general rule, we will not pass upon an issue raised for the first time on appeal." *Constellium Rolled Prods., LLC v. Cooper*, 245 W. Va. 731, 744, 865 S.E.2d 473, 486 (2021) (quoting *Mayhew v. Mayhew*, 205 W. Va. 490, 506, 519 S.E.2d 188, 204 (1999)). Accordingly, we need not consider this argument.

Petitioners also argue that the Second Option is unenforceable under the doctrine of laches, suggesting that too much time elapsed between the creation of the Second Option and Keith McGuire's attempts to execute it in 2020 and again in September of 2023. Petitioners further claim that the circuit court's order gives Keith McGuire another open-ended opportunity to close the Second Option, which would be highly prejudicial to petitioners and inequitable. Accordingly, petitioners claim such an opportunity would be barred by laches, "an equitable remedy which places the burden on the person asserting it to prove both lack of diligence by the party causing the delay and prejudice to the party asserting it." *Grose v. Grose*, 222 W. Va. 722, 728, 671 S.E.2d 727, 733 (2008).

The Supreme Court of Appeals of West Virginia's ("SCAWV") customary brief formulation of the doctrine of laches was stated in *Province v. Province*, 196 W. Va. 473,

---

[5] In West Virginia, the general articulation of the rule against perpetuities requires that "every executory limitation, in order to be valid, shall be so limited that it must necessarily vest, if at all, within a life or lives in being, ten months and twenty-one years thereafter, the period of gestation being allowed only in those cases in which it is a factor." Syl. Pt. 3, *Smith v. VanVoorhis*, 170 W. Va. 729, 296 S.E.2d 851 (1982) (quoting Syl. Pt. 5, in part, *Brookover v. Grimm*, 118 W. Va. 227, 190 S.E 697 (1937)).

483, 473 S.E.2d 894, 904 (1996): "The elements of laches consist of (1) unreasonable delay and (2) prejudice." SCAWV has also stated,

> Laches is an equitable defense, and its application depends upon the particular facts of each case. There are some general principles, however, which a court should be mindful of when determining whether the doctrine of laches is applicable. For instance, "[m]ere delay will not bar relief in equity on the ground of laches. 'Laches is a delay in the assertion of a known right which works to the disadvantage of another, or such delay as will warrant the presumption that the party has waived his right.'" *State ex rel. West Virginia Dept. of Health and Human Resources, Child Advocate Office, on Behalf of Jason Gavin S. by Diann E.S. v. Carl Lee H.*, 196 W. Va. 369, 374, 472 S.E.2d 815, 820 (1996) (citations omitted).

*State ex rel. Webb v. W. Va. Bd. of Med.*, 203 W. Va. 234, 237, 506 S.E.2d 830, 833 (1998).

Upon review of the record, we find that, although petitioners pleaded laches as an affirmative defense in their answer to the operative complaint in the underlying litigation, they presented no evidence or argument at trial in support of the defense. Specifically, they did not argue that Keith McGuire was inattentive or dilatory in exercising the Second Option such that it worked to the disadvantage of Francis McGuire or EC. No evidence was presented to demonstrate how any delay by Keith McGuire was the result of his lack of diligence, and there was no corollary evidence regarding how such lack of diligence worked to the detriment of the petitioners. As our case law explains, it was petitioners' burden to prove, and "the plea of laches cannot be sustained unless facts are alleged to show prejudice to the opposing party, or that the ascertainment of the truth is made more difficult by the delay in seeking immediate relief." *Province*, 196 W. Va. at 484, 473 S.E.2d at 905. Accordingly, we find no error in the circuit court's ruling as to the first assignment.

Next, petitioners argue that the circuit court erred by ordering specific performance of the Second Option in a manner not within its terms, claiming that the court inappropriately re-wrote the contract by ordering petitioners' performance and naming itself as an arbiter to resolve disputes that might arise prior to closing. Petitioners argue that the plain language of Section 6 of the Second Option requires that closing of the option should occur within thirty days from notice of the intent to exercise the option, or, if "either party shall not have fulfilled the Conditions of Closing imposed on him by Section 4 of this Agreement at or before that time, the Closing shall be postponed for a reasonable period of time not to exceed Sixty (60) Days." Petitioners posit that because Keith McGuire did not close the Second Option during the first attempt in spring of 2020, or within ninety days of when he stated his intent to close in 2023, the circuit court should have deemed the option terminated under Section 6 of the Second Option. This argument is unpersuasive.

First, it ignores the circuit court's findings that Keith McGuire's attempt to exercise the Second Option in 2020 was thwarted by Francis McGuire's conduct. The trial court

10

held that Francis McGuire's refusal to provide the requested list of guarantees and/or liabilities to be released at the closing constituted a breach of the parties' option contract and a violation of West Virginia's principle of good faith and fair dealing. Accordingly, petitioners now ask this Court to not only validate the breach of contract but further imbue it with the power to terminate the Second Option itself because it frustrated Keith McGuire's ability to close within the timeframe described in Section 6. This is obviously an absurd and untenable result.[6]

Moreover, we find no abuse of discretion in the circuit court's award of specific performance under the facts of this case. "Specific performance of a contract is not a matter of right, but rests in the sound discretion of the court, to be determined from all the facts and circumstances of the case." Syl. Pt. 2, *Gray v. Marino*, 138 W. Va. 585, 76 S.E.2d 585 (1953); *see also Allegheny Country Farms, Inc. v. Huffman*, 237 W. Va. 355, 360, 787 S.E.2d 626, 631 (2016) ("When a court's legal powers cannot adequately compensate a party's loss with money damages, then a court may use its broad equitable powers to compel a party to specifically perform its promise.") (internal quotations and citations omitted). This extraordinary equitable remedy is available where a contract enforceable at law is proven, and the performance granted is the specific thing called for by the contract. *Brand v. Lowther*, 168 W. Va. 726, 731, 285 S.E.2d 474, 479 (1981). The trial court made detailed, specific findings of fact related to the propriety and necessity of specific performance under the Second Option and the unique circumstances present in this matter, concluding appropriately that Francis McGuire's performance under the Second Option would be the only adequate remedy and we find no error with the court's related findings and conclusions.[7]

---

[6] We note that petitioners do not concede that Francis McGuire breached the contract, but neither do they explicitly assign error to the circuit court for such a determination. Their initial appellate brief argues that the court's conclusion that Francis McGuire breached the agreement is not supported by the weight of the evidence because he testified at trial that he did not have access to CI's books and records in 2020 and, therefore, could not have provided an accurate list of guarantees and liabilities. This is simply a challenge to the circuit court's factual findings that fails to demonstrate that they were clearly erroneous.

Petitioners go on to argue that any breach by Francis McGuire would automatically be excused by Keith McGuire's inability to obtain financing needed to close the Second Option. This unsupported argument, based entirely on circular logic, is meritless. Petitioners cannot claim that closing is impossible when they withheld the information necessary to effectuate that closing and instead offer only rank speculation that Keith McGuire could not meet the terms.

[7] We also find no error in petitioner's bald assertion that the circuit court re-wrote the contract to make itself the arbiter of the contract. Because there was no citation to the

Turning to the counterclaims, petitioners argue that the trial court erred in finding that no partnerships or joint ventures were created between Keith McGuire and CI, CIWR, and EC. Francis McGuire sought a declaration from the court that the three business transactions between the parties were partnerships as a matter of law. Specifically, he advocated that partnerships were created between Keith McGuire and CI for the development of the Mall Property, between Keith McGuire and CIWR for the development of the Georgia Mall Property, and between Keith McGuire and EC for the development of the Fifth Avenue Property. Francis McGuire argues that there has been an ongoing for-profit business relationship between Keith McGuire and CI and CIWR since the parties decided to purchase the Georgia Mall Property. Accordingly, petitioners argue herein that Keith McGuire and CI/CIWR have been acting as co-owners of a business for profit, which qualifies as a partnership under West Virginia law, regardless of the parties' intent, citing *Valentine v. Sugar Rock, Inc.*, 234 W. Va. 526, 766 S.E.2d 785 (2014). Francis McGuire argues that similar conduct between EC and Keith McGuire to work in concert to develop the Fifth Avenue Property is sufficient evidence to demonstrate the formation of a partnership under *Valentine*.

The trial court considered the application of the West Virginia Uniform Partnership Act, West Virginia Code § 47B-2-2 (1995) in its determination that a partnership did not exist between Keith McGuire and CI, CIWR, or EC. The final order described and weighed the testimonial and documentary evidence presented at the bench trial, including *inter alia* deeds and loan documents related to the purchases of the Georgia Mall Property and Huntington Mall Property; written agreements such as the CI Operating Agreement that

---

record as required under West Virginia Rule of Appellate Procedure 10(c)(7), we are left to assume that petitioners refer to the trial court's statement that it would permit the parties to access the court on "an expedited basis to resolve any disputes over what documents Francis McGuire may be obligated to execute or what actions he may be asked to perform in the exercise of the Second Option." It is well established, however, that "a skeletal argument, really nothing more than an assertion, does not preserve a claim[.]" *Megan W. v. Robert R.*, No. 23-ICA-353, 2024 WL 1592600, at \*5 (W. Va. Ct. App. Feb. 27, 2024) (memorandum decision) (quoting *State v. Lambert*, 236 W. Va. 80, 100, 777 S.E.2d 649, 669 (2015)). Moreover, as the SCAWV has held,

> An appellant must carry the burden of showing error in the judgment of which he complains. This Court will not reverse the judgment of a trial court unless error affirmatively appears from the record. Error will not be presumed, all presumptions being in favor of the correctness of the judgment.

Syl. Pt. 5, *Morgan v. Price*, 151 W. Va. 158, 150 S.E.2d 897 (1966); *Cobble v. Lester*, No. 24-ICA-201, 2024 WL 5201017, at \*2 (W. Va. Ct. App. Dec. 23, 2024) (memorandum decision).

identified Francis McGuire as the sole member who formed the company and expressly denied any intent to form a partnership; tax documents filed for CI and CIWR; and the testimony of the parties, including Francis McGuire's testimony that he would not commit to assigning sixty-five percent of the sales proceeds to Keith McGuire if the Georgia Mall Property were to be sold, despite his claim that a partnership existed between CIWR and Keith McGuire and the Georgia Mall Property was a property of that partnership, subject to the partnership allocation. After a thorough review described in its final order, the trial court found the evidence weighed against the formation of any partnerships or joint ventures.[8] "Our guiding standard is that a circuit court's findings in a bench trial, based on oral or documentary evidence, cannot be overturned unless clearly erroneous." *Harrell v. Cain*, 242 W. Va. 194, 205, 832 S.E.2d 120, 131 (2019). Accordingly, because the circuit court's decision is well-supported by the record, we find no error and affirm the ruling in this regard.

Finally, petitioners allege that the trial court erred by failing to order an accounting of CIWR as they sought in their counterclaim, after alleging that Keith McGuire had total control over CIWR since the purchase of the Georgia Mall Property. Petitioners argue that the records that were produced prior to trial were insufficient for petitioners' expert, Eliott Wilson, CPA, to form any opinion regarding the financial status of CIWR. Accordingly, petitioners claim that the circuit court's final order erroneously states that it provided petitioner the requested accounting, because the information produced by Keith McGuire was inadequate to establish an accounting. Petitioners assert it was an abuse of discretion for the circuit court to accept the inadequate information produced by Keith McGuire, even after being advised of its inadequacy at trial through the expert testimony of Mr. Wilson. We disagree.

The record reflects that Francis McGuire filed a Motion for Accounting on November 18, 2022, asking the trial court to require Keith McGuire to "provide a full accounting of the operations of [CIWR], including but not limited to" fourteen categories of documents. The trial court entered an order granting the motion on January 4, 2023, ordering the production of all fourteen categories of documents as requested. The trial court noted in its final order that there was no record before it that any of the requested documents were not produced. Notably, Petitioners filed no motions below alleging the records produced were incomplete and did not seek to compel the production of additional documents. Accordingly, the circuit court concluded that there was no objection to the produced documents and that the accounting was satisfied. We find no abuse of discretion

---

[8] We note that petitioners' counterclaim only alleges the existence of partnerships between Keith McGuire and CI, CIWR, and EC, and the appendix before this Court does not contain evidence that petitioners moved for leave to amend their counterclaims to assert joint ventures. Regardless, the trial court addressed both discrete types of business relationships when it concluded that neither existed.

in this conclusion under these circumstances, and no error on this assignment by petitioners.

Finding no errors or abuse of discretion after considering the allegations raised herein by petitioners, we find no reason to disturb the circuit court's rulings made after its bench trial.

Accordingly, we affirm the circuit court's September 11, 2024, order.

Affirmed.

**ISSUED:** August 29, 2025

**CONCURRED IN BY:**

Chief Judge Charles O. Lorensen
Judge Daniel W. Greear
Judge S. Ryan White

14